IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MERVIN DORIVAL, | : | CRIMINAL NOS. 2004-0154-02, |
| | : | |
| BERNARD GABRIEL, | : | 2004-0154-03, |
| | : | |
| ROBERT RAWLINS, | : | 2004-0154-05, |
| | : | |
| CLYDE EDINBOROUGH, JR., | : | 2004-0154-06 |
| | : | |
| STEFON WILSON, | : | 2004-0154-10, |
| | : | |
| ALRIC THOMAS, | : | 2004-0154-12. |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

Giles, J.                                                                                April 24, 2008

## I.   INTRODUCTION

Before the court are the post-trial motions of defendants in the above-captioned matter.

Defendants Mervin Dorival, Bernard Gabriel, Robert Rawlins ("R. Rawlins"), Stefon Wilson and

Alric Thomas were convicted of participating in a conspiracy to smuggle drugs through the Cyril

E. King International Airport on the island of St. Thomas, U.S. Virgin Islands.  Several of these

defendants, in addition to defendant Clyde Edinborough, Jr., were convicted of substantive

counts of possession of cocaine with intent to distribute, or the aiding and abetting thereof.

Defendant Roy Brewley was also charged in the Superseding Indictment with the conspiracy

count as well as a substantive count, but the court declared a mistrial as to both counts as to

Brewley only and no motions from defendant Brewley are presently before this court.  During

trial, the Government presented the testimony of four cooperating co-conspirators: Brent

Donovan, Meleek Sylvester, Dion Brookes and Danny Rawlins.  Defendants Gabriel, Wilson and

Thomas have filed post-trial motions for acquittal under Fed. R. Crim. P. 29, or in the alternative,

for new trial under Fed. R. Crim. P. 33.  Defendants Dorival, R. Rawlins, and Edinborough have

filed motions for new trial pursuant to Fed. R. Crim. P. 33.

The first part of this memorandum will address defendants' motions pursuant to Fed. R.

Crim. P. 29.  The court will begin with an analysis of defendants' arguments as to Count I,

charging conspiracy to traffic narcotics through the St. Thomas airport.  The court will also

address the defendants' arguments that there was a variance between the single conspiracy

charged in the Superseding Indictment and the Government's proof at trial.  Finally, the court

considers whether there was sufficient evidence to uphold the defendants' convictions on the

several substantive counts charging possession with intent to distribute cocaine.[1]

The second part of this memorandum addresses defendants' arguments for a new trial

under Fed. R. Crim. P. 33, which include arguments that there was such prosecutorial, judicial

and juror misconduct so as to warrant the grant of a new trial.

For the reasons that follow, Defendants' motions are denied in full.  An order scheduling

_____

[1] Dorival, R. Rawlins and Thomas were convicted of Count VI, charging possession with intent to distribute on September 20, 2003.  R. Rawlins was convicted of Count VII, charging possession with intent to distribute on November 8, 2003.  Dorival and Edinborough were convicted of Count VIII, charging possession with intent to distribute on or about November 2003.  R. Rawlins was convicted of Count X, charging possession with intent to distribute on February 21, 2004.  Gabriel, R. Rawlins and Thomas were convicted of Count XI, charging possession with intent to distribute on March 10, 2004.

the sentencing of each defendant will be issued separately.

## II.    RULE 29 MOTIONS FOR ACQUITTAL

### A.    Standard of Review

In considering a motion for a judgment of acquittal under Fed. R. Crim. P. 29, this court must "review the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."  United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (citations omitted).  A finding of insufficiency of the evidence should "be confined to cases where the prosecution's failure is clear."  United States v. Smith, 294 F.3d 473, 477 (3d Cir. 2002) (citing United States v. Leon, 739 F.2d 885, 891 (3d Cir. 1984)).  In reviewing a motion for acquittal, the trial court may not "usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury."  Brodie, 403 F.3d at 133 (citing United States v. Jannotti, 673 F.2d 578, 581 (3d Cir. 1982) (en banc), cert. denied, 457 U.S. 1106 (1982)).  As such, this court will not consider any arguments made by a defendant concerning the credibility of the Government's witnesses when ruling upon these motions.

### B.    Discussion

In evaluating the defendants' Rule 29 motions, the court finds it necessary to recount the evidence in some detail.

1.      **Count I: Drug Conspiracy – Dorival, Gabriel, R. Rawlins, Wilson and Thomas.**

  a.      ***Charge and Evidence***

Count I of the Superseding Indictment charges defendants Dorival, Gabriel, R. Rawlins, Wilson and Thomas[2] with participating in a conspiracy in violation of 21 U.S.C. § 846.[3]  The conspiracy was charged as a "drug trafficking operation whose primary object was to facilitate the movement of narcotics through the Cyril E. King Airport on St. Thomas, U.S. Virgin Islands."  Count I charges a series of alleged overt acts, which the court will not recite herein, the object of which was to place cocaine powder in passenger or passenger type bags and load the same onto non-stop flights to continental United States airports.

The bulk of the Government's evidence consisted of the testimony of four cooperating defendants: Brent Donovan ("Donovan"), Dion Brookes ("Brookes"), Meleek Sylvester ("Sylvester") and Danny Rawlins[4] ("D. Rawlins").  These cooperators testified as to the general modi operandi used to smuggle drugs through the airport, their roles in the operation as well as the roles and activities of each of the defendants standing trial.

Brent Donovan, who had worked as a baggage handler at the airport, testified that he participated in the operation that moved drugs at the airport.  Brent Donovan Test., Trial Tr. 117-118, Nov. 9, 2006.  This operation worked chiefly by the pulling of flight tags from passengers'

---

[2] Defendant Brewley was also charged in this count.

[3] Section 846 states that "Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

[4] D. Rawlins and R. Rawlins are not blood-relatives.

bags, which had cleared or had surreptitiously by-passed customs inspection and were sent to the baggage room for distribution and loading; switching bags; disposing of passenger bags left without flight tags; avoiding security camera detection in the baggage room; and utilizing look-outs to warn others when U.S. customs agents and V.I. Port Authority officers came into the baggage room. Donovan Test. 147, Nov. 9.

Meleek Sylvester, also previously employed as a baggage handler at the airport, testified that he was part of the drug smuggling operation at the airport and that he did so for money, and described how he and others successfully avoided detection by customs officials. Meleek Sylvester Test., Trial Tr. 156-57, Nov. 14, 2006.

The baggage room played a central role. The baggage room was located behind the ticket counters of several small airlines, including Air Sunshine, as well as the Transportation Security Administration ("TSA") inspection area. Meleek Sylvester Test., Trial Tr. 226-28, Nov. 13, 2006. It had two baggage belts. Sylvester Test. 227, Nov. 13. There were also baggage belts behind the ticket counters of the small airlines, including Air Sunshine.[5] Donovan Test. 155, Nov. 9. The belts in the baggage room held bags that had been checked-in and had passed through customs. Sylvester Test. 227, Nov. 13. The belts carried baggage designated for different airlines. Sylvester Test. 227-29, Nov. 13. Cameras were mounted in the baggage room that focused on the second baggage belt, but columns in the room obstructed the cameras' view of the back of the room, behind the second belt. Sylvester Test. 230, Nov. 13.

_____

[5] These baggage belts were in an area separate from the main baggage room, and no direct line of sight exists from the baggage room to these other baggage belts. Donovan Test. 245, Nov. 9.

Bags would be removed from the belts of smaller airlines and brought into the baggage room or packed onto carts to be loaded onto airplanes.  Donovan Test. 160, Nov. 9; Sylvester Test. 221, Nov. 13.

There existed several methods by which cocaine was moved through the airport and onto airplanes by concerted activity.  The first, and most common, modus operandi by conspirators involved the removal of baggage flight tags from legitimately checked luggage and placement of these tags on bags without flight tags that contained narcotics and that had by-passed airport security.  An individual working in the baggage room would select a bag from the second baggage belt.  Donovan Test. 165, Nov. 9.  Small bags were preferred because they were easier to displace.  Donovan Test. 165, Nov. 9.  Destination, as indicated by the airline flight tag, was also important because a bag needed to have the same destination as the intended drop of the cocaine being smuggled.  Donovan Test. 165, Nov. 9.

A conspiring baggage handler would select a piece of checked luggage from the baggage belt, pull the bag off of the belt, remove the flight tag and take out any valuables.  Sylvester Test. 228, Nov. 13.  Such baggage handlers waited for the bags and removed the tags on the far side of the second belt in order to avoid detection.  Donovan Test. 167, Nov. 9.

Having obtained a flight tag from an item of checked baggage, a conspiring baggage handler would take that tag to a location where untagged bags were being held, such as the Air Sunshine front desk or Dion Brookes' Air Sunshine Office.  Donovan Test. 168, Nov. 9; see also Sylvester Test. 228, Nov. 13 ("You take the tag and you put it on the carry-on that was being brought out from, around the other side by the baggage belt by Air St. Thomas.").

Dion Brookes, also a cooperating co-conspirator, worked at the airport as a manager for

Air Sunshine airline.  Sylvester Test. 224, Nov. 13.  In exchange for money, Brookes held for the

co-conspirators bags containing cocaine in his office or behind the Air Sunshine front desk.

Donovan Test. 168, Nov. 9.  A removed flight tag would be placed on one of these bags, which

was then taken to the baggage belt in the baggage room, despite the bag not having cleared TSA

or customs inspection.  Sylvester Test. 228, Nov. 13.  The original checked bag would be thrown

away or otherwise discarded.  Sylvester Test. 228, Nov. 13.  Bags from the belts in the room

would be packed, by baggage handlers, onto carts so as to be loaded into the belly of an airplane.

Donovan Test. 161-62, Nov. 9.

Sometimes Brookes would place bags containing drugs on the Air Sunshine baggage belt

to transport them to the back, near the baggage room, where they would be taken into the

baggage room and loaded onto flights.  Donovan Test. 159, 220-21, Nov. 9; Sylvester Test. 221-

24, Nov. 13.  On occasion, someone would bring a bag containing drugs directly into the baggage

room through one of the doors leading into the baggage room.  Sylvester Test. 221-22, Nov. 13.

The storage of bags in Brookes' office, coupled with the switching of flight tags, was not

the only method utilized.  A second method involved an individual who brought cocaine into the

airport by packing it onto his person or in a small container.  If packed on the person, the cocaine

had to be packed "flat" so as to avoid detection.  Danny Rawlins Test., Trial Tr. 172-73, Nov. 15,

2006 (discussing Government Exhibit N-15, an audiotape conversation between D. Rawlins and

Wilson on August 24, 2004).  Then, in the baggage room or in the belly of the plane, the cocaine

would be packed into a specific, pre-identified piece of checked baggage, or other baggage as

circumstances required.  See Government Exhibit N-19 (audiotape conversation among

Sylvester, Thomas and R. Rawlins on August 30, 2004); Sylvester Test. 190-194, Nov. 13.

Having outlined the general parameters of the conspiracy and the various methods used by its participants, the court turns to specific testimony.

Brookes held bags and other containers for several airport employees in his office or behind the Air Sunshine front desk from 2000 to 2004. Dion Brookes Test., Trial Tr. 64, Nov. 16, 2006. Dorival asked him to hold bags containing cocaine. Brookes Test. 65-67, Nov. 16. He held bags for Dorival periodically until 2003. Brookes Test. 65-67, Nov. 16. Brookes testified that he believed that these bags held cocaine because Dorival told him this and Brookes was paid substantial monies for his cooperation and concealment. Brookes Test. 66-67, Nov. 16. Brookes held the bags in his office for Dorival until "one of the ramp guys" came to pick them up. Brookes Test. 69-71, Nov. 16. The "ramp guys" specifically included R. Rawlins and Brent Donovan. Brookes Test. 69-71, Nov. 16. Dorival paid Brookes for holding bags of cocaine and made six payments of $1,200.00, one payment for each transaction. Brookes Test. 67, 130, Nov. 16.

Brookes held bags for R. Rawlins on two occasions, and on the second occasion, R. Rawlins told him that the bags contained cocaine. Brookes Test. 73, Nov. 16. Brookes held these bags until R. Rawlins picked them up. Brookes Test. 74, Nov. 16. When he came to retrieve his bags, R. Rawlins brought with him flight tags that he placed on the bags. Brookes Test. 74, Nov. 16. He then left, with the newly tagged bags, through the back door of Brookes' Air Sunshine office. Brookes Test. 74, Nov. 16. That door led, to the right, to the baggage room and ramps, and, to the left, to a long walkway leading to doors opening to the boarding gate area inside the airport. Brookes Test. 179-83, Nov. 16. R. Rawlins paid Brookes for holding the bags. Brookes Test. 74, Nov. 16.

Brookes also held bags for Wilson[6] behind the Air Sunshine counter on three occasions, for which he was paid $700.00 by Wilson on one occasion.  Brookes Test. 76-78, Nov. 16.

On two occasions, Brookes held shoe boxes in his Air Sunshine office for Gabriel. Brookes Test. 80-82, Nov. 16.  Gabriel retrieved these boxes himself and left Brookes' office through the back door.  Brookes Test. 83, Nov. 16.  While Brookes testified that he believed the boxes contained cocaine, he did not testify as to the basis of his personal knowledge.  Brookes Test. 81-82, Nov. 16.

Brookes also held bags for Sylvester.  He held these bags for Sylvester until someone came to his office with flight tags and tagged the bags.  Brookes Test. 83-84, Nov. 16. R. Rawlins and Donovan both came to Brookes' office to pick up Sylvester's bags.  Brookes Test. 84, Nov. 16.  Dorival paid Brookes for holding the bags for Sylvester, and as noted above, Dorival paid Brookes $1,200.00 on six occasions.  Brookes Test. 130, Nov. 16.  Brookes explained that:

> What happened is when [Sylvester] bring me tags, it's [Sylvester's] own bags.  When [Dorival] bring me bags, it's [Dorival's] own bags. . . . I figure out that the job is between [Sylvester] and [Dorival], and [Dorival] bring me in as the middleman to secure the bag . . . hold the bag in Air Sunshine office. . . . All the payment always come from [Dorival].

Brookes Test. 141-42, Nov. 16.

Finally, Brookes held bags in his office for Donovan.  Donovan would call Brookes when he had a flight tag, Brookes would place the tag on the bag and then give the bag to Donovan. Brookes Test. 85, Nov. 16.

---

[6] Brookes testified that Wilson's nickname is "Demel."  Brookes Test. 75-78, Nov. 16.

The Government presented evidence that defendant Thomas supplied cocaine to be smuggled through the airport using the smuggling operation, through Sylvester, in whatever form the operation existed to ensure that the drugs arrived at the destination airport "safe." See Gov't Ex. N-19. Sylvester testified that he had several meetings with Thomas, the purpose of which was for Thomas to give Sylvester luggage containing cocaine or packages of cocaine to smuggle through the airport, as well as cash. Prior to meeting with Thomas, Sylvester spoke with Dorival, who assured him that Sylvester "could go ahead and get the drugs and give it to him . . . and he will handle the rest." Sylvester Test. 152, Nov. 13. The first such meeting took place in March 2002. Sylvester Test. 140, Nov. 13. The night before this meeting, Thomas called Sylvester to arrange a meeting "to have an exchange of cocaine, a bag of cocaine and money to . . . be transported on the airport." Sylvester Test. 141, Nov. 13. This meeting involved ten kilograms, or "keys," of cocaine and $20,000.00 as payment. Sylvester Test. 141, Nov. 13. Thomas gave Sylvester a Pullman carry-on size suitcase containing the cocaine, which he told Sylvester needed to go to Newark, New Jersey on Continental Flight 1902. Sylvester Test. 154, 156, Nov. 13. After the meeting, Sylvester contacted Dorival, who instructed Sylvester to meet him to give him the bag containing cocaine. Sylvester Test. 154-55, Nov. 13.

Sylvester again met with Thomas in April, May, June, and July of 2002, the circumstances of which mirrored those of the first meeting: Thomas gave Sylvester one or more pieces of luggage containing cocaine to be stowed onto Continental Flight 1902, going non-stop to Newark, New Jersey. Sylvester Test. 156-64, Nov. 13; Sylvester Test. 103, Nov. 16. Thomas paid Sylvester in cash, and Sylvester arranged with Dorival to take the bags containing cocaine the day after a clandestine meeting between Sylvester and Thomas. Sylvester Test. 156-64, Nov.

13; Sylvester Test. 103, Nov. 16.  Thomas would then contact Sylvester to let him know when

the bag of cocaine arrived at its destination safely, or "blessed."  Sylvester Test. 157, Nov. 13.

Sylvester paid Dorival after word came from Thomas that "everything was blessed."  Sylvester

Test. 159, Nov. 13.

In January 2003, Sylvester spoke with Thomas about "getting back to the operation of

transporting drugs to Continental 1902 to New Jersey."  Sylvester Test. 164-166, Nov. 13.  They

discussed changing methods, due to a seizure of drugs on July 13, 2002, and storing the bags

containing drugs in Dion Brookes' Air Sunshine office.  Sylvester Test. 166, Nov. 13.  Dorival

had arranged for Brookes' office to be used to store these bags until he could take each bag to the

baggage area and load it onto an airplane.  Sylvester Test. 166-67, Nov. 13.  In late January 2003,

when Sylvester and Thomas met, Thomas entrusted him with a bag containing cocaine to be

placed onto Continental Flight 1902, as well as cash.  Sylvester Test. 170, 173, Nov. 13.  The

next morning, Sylvester picked up Brookes at his home and dropped him off at the airport, along

with the bag.  Sylvester Test. 170-71, Nov. 13.  Brookes told Sylvester that he had spoken with

Dorival and understood that he was being picked up so that he could hold a bag containing

cocaine.  Sylvester Test. 171, Nov. 13.  Again, Sylvester did not pay Dorival his share of the

money until the cocaine arrived "blessed" in Newark, New Jersey.  Sylvester Test. 173, Nov. 13.

Thomas and Sylvester also met for drug smuggling purposes in February 2003 and similar

smuggling transactions followed as described above.  Sylvester Test. 174-75, Nov. 13.

Sylvester and Thomas did not meet again until September 19, 2003.  Then, Thomas asked

Sylvester if he could smuggle three bags and, after checking with Dorival, Sylvester told Thomas

that the intended smuggling was possible.  Sylvester Test. 176-77, Nov. 13.  When the two met

that evening, Thomas gave Sylvester three bags, each containing ten kilograms of cocaine, and gave him $60,000.00 as payment.  Sylvester Test. 177, Nov. 13.  The next day, Dorival and Brookes retrieved these bags from Sylvester's car at the airport.  Sylvester Test. 179, Nov. 13.

In March 2004, Sylvester utilized the second modus operandi, skipping the intermediary step of storing a bag in Brookes' office.  Sylvester met with Thomas, who gave him two kilograms of cocaine, which were not placed in a suitcase.  Sylvester Test. 189-90, Nov. 13.  Sylvester took these packages of cocaine into the airport and packed them into a piece of checked luggage in the baggage room.  Sylvester Test. 195, Nov. 13.  He did so behind a "wall" of luggage that he constructed after he told R. Rawlins and Gabriel, then standing in some place in the baggage room, that he was going to put the two kilograms of cocaine into a bag and they had responded, "Go ahead.  Do your thing."  Sylvester Test. 194-95, 206, Nov. 13.

After the March 2004 meeting, Sylvester decided not to meet Thomas whenever Thomas asked for a meeting.  Sylvester Test. 207-09, Nov. 13.  When Thomas asked Sylvester whether anyone else would meet him, Sylvester told him he would check with R. Rawlins.  Sylvester Test. 208-09, Nov. 13.

Sylvester was arrested on August 13, 2004.  Sylvester Test. 209-11, Nov. 13.  Thereafter, he began cooperating with the Drug Enforcement Agency ("DEA").  Sylvester told the agents that when Thomas learned Sylvester was moving from St. Thomas, Thomas had asked Sylvester to set Thomas up with someone else who could assist with drug smuggling.  Sylvester Test. 213-14, Nov. 13.  At the direction of the agents, Sylvester arranged to meet Thomas and R. Rawlins on August 30, 2004.  Sylvester Test. 213-14, Nov. 13.  Sylvester testified that the purpose of this meeting was for Thomas and R. Rawlins to get to know each other "to continue their operation

with drug smuggling." Sylvester Test. 214, Nov. 13.  Government Exhibit N-19, an audiotape of

the conversation taking place on August 30, 2004, shows that this was the understanding and

purpose of Thomas and R. Rawlins[7]:

> MS:   That's my partner Rawlins.  Rawlins, this "O", or "Q", or "Quince".
>
> AT:   "Q", yo check.  My boy done talk to you or what?
>
> RR:   Yeah.
>
> AT:   When you going to go do your vibes it gotta be small.
>
> MS:   I guess it got to be like vacuum seal and you check like -
>
> AT:   Yeah, yeah.
>
> MS:   Like that kind of vibe, because it got to be like he holding it on him and them kinda thing yo check.
>
> AT:   I know concrete and solid, cause my main thing is like once I ain, he know how I is, yo check.  Me and he went back from years, yo know what I ah mean, like from youth man and them vibe, yo check.  But yo--know my main thing is man, once man ain no thief, and man ain no rat, and them vibe, yo know what I mean, everything safe because I is a man, I solid, solid, solid, yo check.  I ain't playing with nobody money.  I ain't into no funny vibe.  I ain into nothing, yo know what I mean.  Certain time I don't self be here, yo check.  Certain times I might'n self be here, yo check.  But I is a man like, like when I ain been here and thing, I will send a man to check he, and he done know anybody I send solid, solid, solid and ain't into no funny vibe and, ain't into nothing. Yo know what I mean?
>
> RR:   Way part you goin?

---

[7] For the purposes of the excerpt, the speakers are designated as follows: Alric Thomas is "AT", Robert Rawlins is "RR" and Meleek Sylvester is "MS."

AT:    Well, ahm, the vibe ahm, up ahm, so you could work the
       regular route, what - like Continental?

RR:    Nah.

AT:    Well, what yo could work on?

RR:    NY direct.

AT:    New York.

RR:    Mmm mmm.

AT:    That's what, American?

RR:    Yeah.

AT:    And ahhmmm, what bout on US?

RR:    We don't do US.

AT:    Just American?

RR:    Yeah.
. . .

AT:    Cause how I is right, he does tell me an ting, like you know,
       like what happening and what going on, and you see what I
       saying?

RR:    Hmmm.

AT:    He does tell me like sometimes, what route good to go, yo
       know what I mean.  Like what working, and then from
       there I would analyze, well okay, this is what I doing or
       whatever, whatever, you check?

RR:    Well, right now I don know how it is up deh with this 911
       fuck, yo know how it is in New York.  I don't know yo
       check, because it coming up, I don't know yo check.

AT:    Ah ha.

RR:     Dem man might get strict and thing, but everything should be safe up they.

AT:     I mean - I mean I ain gah no problem with it yo know, but, yo know certain man get lil connect to certain places, yo check.  Like inside connect, like whereas if you ain send somebody, or if you send somebody and they just goin well pick up, pick up their bag or whatever yo know what ah mean.  Is like, the people them will let yo know everything cool, yo know what ah mean, so certain places man get lil inside vibes yo check.  Yo see aht ah saying?  Like, the same vibe that we been working with, yo check, but that one was what Conti, right, yo check.

RR:     Yeah

AT:     But de vibe, de vibe, de vibe on American, way that going? Miami, New York, which one?

RR:     The one, the one going, the one I telling you about is direct New York.

AT:     And which part, LaGuardia, Kennedy?

RR:     Kennedy.

AT:     Kennedy; right, right.

RR:     The other, the other, the one going Miami, but that one going cut out soon.  The morning one goin cut out.  That use to be a good, direct Miami early morning, yo check. From next week Tuesday, it ain going to have that no more.

MS:     That's when they cutting out, next week Tuesday?

RR:     Yeah.

AT:     I is just a man that I want you show me what working too, yo see what ah saying?

RR:     Hmmm.

AT:     Like in case man could switch up, yo know what ah mean,

do little things different still, yo check, yo know what ah mean.  Switch up the route sometimes, whatever, whatever, but you work that already straight de.

RR:   Yep, yep.

AT:   Because why I ask, because I know sometimes like on that end, especially through New York, sometimes it does get them van vibe, yo check.

RR:   Yeah, yeah I know.

AT:   Yo see what I saying?

MS:   You work anything recently?

RR:   Yeah recently.

MS:   And it was straight?

RR:   It was straight.

MS:   How recent?

RR:   Wednesday, brother.

MS:   Yeah, just gone?

RR:   Yeah.

AT:   So ahm, let me ask right like ahm, like what ah you do, like ah you use like somebody to go.

RR:   Yeah, somebody need to go at least to check in a bag.

AT:   Okay, so ahm, okay, so now with that de now right, how, how, how you want it be like when it comes to that de? Like the same way we use to do it?  Like you see whatever.

RR:   Yeah.

AT:   Or we show him whatever tag goin be on it or whatever, whatever, whatever.  So you done know.

RR:   Yeah, so long as it done mark and then bam, yo know what I ah mean?

AT:   And then let you know like around what time this flight is.

RR:   But the thing is right, yo got to be early.

AT:   Like whoever got to move early.

RR:   Yeah.

AT:   Like check in early, early.

RR:   As early as possible because that late thing don't cut it brother.

AT:   Yeah, yeah, yeah.

RR:   Yo check?

AT:   It goin be too tight.

RR:   Yep.  You goin be deh waiting, an it goin be off schedule, off schedule - the thing goin be up deh, and you down here still waiting, and then these man here might just pop out.

AT:   Okay, and - and, let me ask you right now with that de now right, cause I mean, he use to explain everything to me in detail like this and that, and what is what right.  With that vibes de now right, is like ahm, okay, once it's like that and somebody going, you will take off their original tag.

RR:   Yeah, I could switch it and just to leave the (inaudible)

AT:   And clean up that deh, and all of that deh

RR:   Just to be on the safe side, okay?

AT:   Yeah, yeah, yeah.

RR:   But, what I'm sayin - once everything leave from here safe you shouldn't really have no problems with it.

AT:     Yeah, yeah I understand.

RR:     But once they got some kind of suspect like some fuck happen, they goin either come and check it, and if they ain't see nothing, they goin still call up deh, yo check.

AT:     Yeah, yeah, yeah.  That's why, yo know that's why is like, yo know what ah mean, your end got to be straight too, you know.

RR:     Yeah.

AT:     I, I know you know what you doing.

RR:     If you know anybody, if you want to like - tell them look just run through and check out up deh is you, - cause me ain want you to say that something get fuck-up, yo check.

AT:     Yeah, yeah, yeah.  And you is a man, like, if you see it looking lil funny or whatever, whatever, whatever, yo just hold off.

RR:     And that's another thing, if I see anything, I goin just hold the whole fuck and done it.  Yo check.

AT:     Yeah, yeah, yeah.

RR:     Ain good to be no fucking hero.  Bam, you send somebody to do it and they deh fucking up, yo know what I am saying?

AT:     Yeah, yeah.

RR:     Me ain saying you goin be sending no idiot, but some of them people can't take pressure yo know.

AT:     Yeah, yeah.  Yeah, but like I does say, the same thing like what you say yo know it got to be straight from this end you check.

RR:     Yeah, yo got to.

AT:     Yeah.

RR:   And the best day to deal with that de is on a Wednesday.

AT:   Wednesday?

RR:   I could get it from the night before and just go with that one time, yo check.

AT:   Yeah, right, right, right, right, because, see I just a man.  I just like to take my time too, yo check.  I don't like to rush, rush to because I ain just thinking like just for today and tomorrow, yo know what ah mean, yo check.  Yo know what ah mean, I want think for like, yo check.

. . .

RR:   I goin deal one time.  You bring something to me - everything one time, yo check.

AT:   Eh?

RR:   Bring cash, bring thing one time.

AT:   Right, right, right, right, right, right.  So wha about the little carry on kind vibe?

MS:   Mmmm, mmm, it got to be, Rawlins if it small, how much it could be?

RR:   Hmmm, the most I'll say, three or four.

AT:   That's good, that's good.

MS:   But tell the man, tell the man because it can't be, it can't be the regular brick them.

RR:   Them big heck, you know what I mean?

MS:   It can't be the regular brick.  It go to be kinda like, mean know how yo does bust it down or whatever, but it got to be like vacuum seal way part partner could.

AT:   I know how yo mean because I know how you mean man, cause I know how yo mean man.  De other day, de other day, I run into some of that de man.  This vibe here like so

flat, is like you could actually put it on whoever, yo check, yo see what I saying.  I, I know a man who say he could get it like that de, yo check.

. . .

AT:    I don't play game when it come to, yo see what I saying, with that de man.

MS:    Them man go bring, he go bring material and paper at the same time.

AT:    I, I, I ain self shorting you a dollar, yo know what ah mean. Yo see what ah saying?

RR:    Yeah.

AT:    I is a man, I ain't into no funny vibe man, yo check.  Once a man straight up and ain into no funny vibe, and man solid, yo check, what I saying and man ain't no thief, yo know what ah mean, man could just do what man got to do.  It's just, you handle your end, and I going to handle what I got to deal with.  Yo see what I am saying.  You just got to deal with what you got to deal with, yo check.

. . .

[R. Rawlins and Thomas exchange phone numbers]

RR:    But ahm, when you, when you want to do the thing.

AT:    Well, yo know let me, let me - I, I, I going have to get myself straighten up and line up something, yo check.

RR:    Oh, okay.

AT:    You see what ah saying?

RR:    Hmm.

AT:    But I, I, I'n let you know if anything man, yo check.  Man could just start off feeling out the vibe first, and then just start from deh, yo check what ah saying?

RR:    Yeah, okay.

AT:    I is a man, I doh, yo know what ah mean, I doh, I doh try to deal with faith and patience too man, yo know what ah mean.  Like, cause, money goin make, yo check, yo know what ah mean, but the most thing I used to tell he is like safety, yo check.  Yo see what ah saying?  I ain't no man who does just be thinking money, money, money, like yo know what ah mean, yo check.  I like to deal with security, make sure, yo know what ah mean like yo know what ah mean.  Once you safe and you aright, everything going be, yo know what a mean.  That's how I does think, yo check what ah saying, yo check.  Yeah man, yo check.  That's how I does think man.

Gov't Ex. N-19 (emphasis added).  This conversation well demonstrates that although Thomas

and R. Rawlins had never met, they had in common the same drug smuggling conspiracy.

      Danny Rawlins, a red-cap, or porter, at the airport, also testified as a cooperating co-

conspirator.  He testified that he had two encounters with defendant Edinborough in 2003, in

which Edinborough gave him a bag that contained multiple kilograms of cocaine to be smuggled

through the airport.  D. Rawlins Test., Trial Tr. 113, 114, 119, 121, 124, Nov. 15, 2006.  Before

meeting with Edinborough, D. Rawlins checked with Dorival whether drugs could be moved

through him, and Dorival confirmed that they could.  D. Rawlins Test. 116, 124, Nov. 15.  After

each meeting with Edinborough, D. Rawlins gave the bag containing cocaine to Dorival.

D. Rawlins Test. 120, 126, Nov. 15.  D. Rawlins began cooperating with the Office of the United

States Attorney during the summer of 2004.  D. Rawlins Test. 139, Nov. 15.

      Brent Donovan, formerly employed by American Eagle as a baggage handler at the St.

Thomas airport, testified that he pulled flight tags from checked luggage and that he would then

take these tags to Brookes' office to place on bags held there.  Donovan Test. 111, 115, 118, 165,

Nov. 9.  Donovan worked for both Dorival and Gabriel in pulling flight tags from checked bags.

Donovan Test. 127, 130, Nov. 9.  Donovan pulled flight tags for Gabriel three times between

November and December 2002.  Donovan Test. 127-28, Nov. 9.  Donovan received payment

from Gabriel for pulling flight tags, but he stopped working for him because Gabriel did not pay

him on time and, on one occasion, paid him with a counterfeit one-hundred dollar bill.  Donovan

Test. 129, Nov. 9.  Dorival approached him and asked him to get a flight tag for him and told

Donovan "not to worry about [Gabriel] because he doesn't pay on time."  Donovan Test. 131,

Nov. 9.  Dorival instructed Donovan to wear gloves when he removed flight tags from checked

bags.  Donovan Test. 146, Nov. 9.  In April 2003, Donovan was involved with R. Rawlins in

obtaining flight tags.  Donovan Test. 271, Nov. 9.  Donovan had also acted as a look-out for

Dorival and R. Rawlins, and Dorival and Gabriel had acted as look-outs for Donovan.  Donovan

Test. 147-48, Nov. 9.  Donovan began cooperating with federal agents on September 20, 2003,

following a seizure of drugs at the airport resulting from the discovery of two bags without flight

tags by Don Donovan,[8] another airport employee.  Donovan Test. 116-18, Nov. 9; Don Donovan

Test., Trial Tr. 61-63, Nov. 9, 2006.

　　　　In addition, the court specifically incorporates the evidence discussed below in

conjunction with the substantive counts as the evidence relates to the conspiracy count.

　　　　**b.**　　　***Law of Conspiracy***

　　　　It is well-established that a conspiracy has three essential elements: "(1) a shared 'unity of

purpose,' (2) an intent to achieve a common goal, and (3) an agreement to work together toward

---

　　　　[8] Don Donovan is a different individual than cooperating co-conspirator Brent Donovan.
While Don Donovan did testify, all transcript references to "Donovan" are references to the
testimony of Brent Donovan, unless specified as that of "Don Donovan" or "D. Donovan."

the goal."  United States v. Mastrangelo, 172 F.3d 288, 291 (3d Cir. 1999) (citing United States v. Wexler, 838 F.2d 88, 90-91 (3d Cir. 1988)).  Proof of participation in a conspiracy requires "a demonstration that a defendant has knowledge of the illegal objective contemplated by the conspiracy."  United States v. Perez, 280 F.3d 318, 343 (3d Cir. 2002) (internal quotations and citations omitted), cert. denied, 537 U.S. 859 (2002).  The "elements of a conspiracy may be proven entirely by circumstantial evidence, but each element of the offense must be proven beyond a reasonable doubt."  Wexler, 838 F.2d at 90 (internal quotation and citations omitted).

In United States v. Gibbs, the Third Circuit outlined factors used to determine whether a buyer had joined a larger drug conspiracy, including "the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; and whether there is a demonstrated level of mutual trust."  190 F.3d 188, 199 (3d Cir. 1999).  The Third Circuit, however, has cautioned that factors enumerated by any court are not direct proof "that a conspiracy exists; rather, their presence serves as circumstantial evidence of the underlying agreement that is itself necessary to sustain a conspiracy charge."  United States v. Pressler, 256 F.3d 144, 149 (3d Cir. 2001) (emphasis added) (citing United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986), cert. denied, 479 U.S. 821 (1986)), cert. denied, 475 U.S. 1024 (1986), and cert. denied sub nom. Briggs v. United States, 479 U.S. 821 (1986).  As such, the court's analysis will focus on the elements of the offense of conspiracy itself, not factors developed through the case law.

The government is not obligated to prove that "each defendant knew all of the conspiracy's details, goals, or other participants."  Gibbs, 190 F.3d at 197 (citing United States v. Theodoropoulos, 866 F.2d 587, 593 (3d Cir. 1989), overruled on other grounds by United States

v. Price, 76 F.3d 526, 527-28 (3d Cir. 1996)).  Even an occasional participant "can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation."  Gibbs, 190 F.3d at 198 (internal quotations and citations omitted).  Distilled even further, "there must be evidence tending to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment."  United States v. Schramm, 75 F.3d 156, 159 (3d Cir. 1996) (quoting United States v. Scanzello, 832 F.2d 18, 20 (3d Cir. 1987)).

Further, in determining whether the Government presented sufficient evidence to sustain a conspiracy conviction, it is not relevant whether the evidence also "permits a less sinister conclusion" because the evidence does not need to be inconsistent with every conclusion except that of guilt.  Smith, 294 F.3d at 478 (quoting United States v. Dent, 149 F.3d 180, 188 (3d Cir. 1998), cert. denied, 525 U.S. 1085 (1999)).  The court must accept the jury's verdict "if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt."  Gibbs, 190 F.3d at 197.

The case law is replete with metaphorical references to help capture the inchoate crime of conspiracy.  The most common metaphors include "chains" or "wheels."  The use of such metaphors has obvious limitations that, if too strictly adhered to, impede, rather than facilitate legal analysis.  As the Fifth Circuit has aptly noted, "the problem is difficult enough without trying to compress it into figurative analogies.  Conspiracies are as complex as the versatility of human nature and federal protection against them is not to be measured by spokes, hubs, wheels, rims, chains, or any one or all of today's galaxy of mechanical[,] molecular or atomic forms."  United States v. Perez, 489 F.2d 51, 59 n.11 (5th Cir. 1973), cert. denied, 417 U.S. 945 (1974).

Another appellate court has observed that "[m]ost narcotics networks involve loosely knit vertically-integrated combinations."  See, e.g., United States v. Panebianco, 543 F.2d 447, 452 (2d Cir. 1976), cert. denied, 429 U.S. 1103 (1977).

        c.     *Application*

The court finds that after consideration of the evidence in the light most favorable to the Government, a rational jury could have found that the Government produced sufficient evidence such that it could conclude, beyond a reasonable doubt, that each of the charged defendants was a member of the conspiracy charged in the indictment.  The court has considered each defendant's motion for acquittal individually.

The Government submitted evidence that there was a conspiracy, based at the airport in St. Thomas, the object of which was to smuggle cocaine through the airport onto airplanes without detection by United States customs, TSA, the Virgin Islands Port Authority or any other officials.  There is sufficient evidence for the jury to have found that each of the defendants who was convicted of this count joined in that conspiracy by sharing a unity of purpose, demonstrating an intent to achieve a common goal, and agreeing to work, together, toward that goal.  The use of the baggage room at the airport constituted the core of this conspiracy, and Brookes' office and the Air Sunshine front desk were extensions of the baggage room.  The conspiracy utilized two primary modi operandi to move cocaine through the airport and onto airplanes, as discussed above.

Participation in the conspiracy was evident in two main ways.  First, there was physical participation.  This consisted of pulling flight tags from checked baggage, providing bags to be stored, storing bags, placing flight tags on unchecked bags, disposing of or destroying checked

baggage, carrying packages of cocaine, packing cocaine in bags, engaging in financial

transactions and acting as look-outs.  The evidence abounds that each of the defendants convicted

of the conspiracy count performed at least one of these actions in furtherance of the conspiracy

charged.  Second, there was participation through an understood and obvious code of mutual

protection, concealment and silence.  Such protection was apparent when, for example, on March

10, 2004 Sylvester told R. Rawlins and Gabriel that he was packing two kilograms of cocaine

into a suitcase.  Sylvester was confident that they would not and could not tell officials of his

criminal conduct because they themselves were engaged in the same drug smuggling operation.

The evidence was clear that the individuals who participated together were able to do so

because they shared information regarding the common modality of smuggling cocaine onto

airplanes, and kept that information within the "circle of users."  When called upon, that

particular modus operandi could be employed with the confidence that it would go undetected by

persons outside the circle.  There was direct and circumstantial evidence that there was a

comfortable reliance by all participants in the circle.  They could and did use each other to

protect and promote drug smuggling through use of checked or seemingly checked passenger

bags.  Cooperative affirmative acts, through assistance in obtaining tags or acting as look-outs,

were essential to the success of every smuggling transaction.

It was obvious from the evidence that all baggage handlers worked in a special security

clearance relationship with the Virgin Islands Port Authority and that, consistent with Sylvester's

testimony, all within the conspiratorial circle knew what was going on in the baggage room

because it could not go on without detection by those who worked in the same close area.

Therefore, each conspiratorial defendant used that confidence to bring drug bags through

Brookes' office, through the baggage room and/or onto planes with a sense of impunity. This concealment could not work unless each participant performed a necessary function, such as endeavoring not to leave for discovery passenger bags on the tarmac with no flight tags. It turns out that it was just this "slip up" that led to the unraveling of the charged conspiracy. The conspiracy was predicated on mutual cooperation using a system or systems, which relied necessarily on the silence and concealment of those working in the baggage room area to avoid detection by cameras or customs authorities.

The common utilization of Brookes' office, whether to store bags or pick up bags containing cocaine to then relocate to the baggage room for the next step of being loaded onto the airplane, demonstrates the common dependency. By going to Brookes, the conspirators relied not only on Brookes' silence, but on the silence of everyone else who was working, or had worked, with him. As Sylvester testified, the area in the airport where much of this activity took place was small, and there was the opportunity to observe other handlers pulling baggage tags, taking bags from Brookes' office and leaving Brookes' office with bags. Brookes relied on everyone who dealt with him. While the modi operandi may have changed from time to time and some participants may have only participated occasionally, there was interdependence among all of the defendants charged in the conspiracy count on the same baggage handling operation: getting a flight tag on a bag containing cocaine. The interdependence among those playing these different roles is highlighted by how a failure to complete one task had a domino effect leading to detection. The discovery of two passenger bags on the tarmac without flight tags on September 20, 2003 prompted a DEA investigation and a contemporaneous seizure of cocaine.

When each co-conspirator undertook a drug smuggling event, he necessarily knew that he

would have to use various personnel in the chain of functions to transport and secure drug-filled passenger bags from the point of customs inspection to release into the belly of a waiting airplane without detection by authorities.  The conspiracy, once established, could go on indefinitely, relying on all those participating, and who had participated, to actively participate or assist in any way that became necessary to ensure that the attempted transaction would succeed.

When, for example, defendant Wilson brought a bag of cocaine for storage in Brookes' office, he demonstrated a knowledge of, and reliance upon, others who had utilized or were utilizing Brookes' office in some way.  That criminal undertaking depended on a network of persons involved in the same criminal venture.  Wilson had to have been aware that Brookes himself could not get that bag securely onto an airplane.  Brookes was expected to protect the bag from anyone outside of the circle, until someone from within the circle came for the bag.  Therefore, necessarily, Wilson agreed, by such actions, to participate in whatever conspiracy that utilized Brookes and that Brookes utilized to smuggle drugs onto airplanes bound for the continental United States.  The jury could properly infer all of this using their common sense.  The jury could have reasonably concluded that only those who are, or were, participants in the charged conspiracy could be trusted to handle any bag containing cocaine to ensure that it ultimately went onto an airplane without detection or suspicion and that it arrived safely at its destination.

The court will address the sufficiency of the evidence as to each defendant charged with conspiracy.

## I.    Mervin Dorival

The convictions evidenced that the jury believed the testimony of the cooperating

witnesses regarding Dorival's participation in drug smuggling activity charged in the indictment. Dorival used the baggage room and Brookes' office for drug smuggling.  Dorival worked in smuggling activities with Donovan, Sylvester and Brookes.  Sylvester testified that he brought to Dorival many kilograms of cocaine to be smuggled through the airport using the method of switching flight tags on passenger luggage that had gone through TSA inspection or was diverted around TSA inspection by use of Dion Brookes' Air Sunshine office, which gave co-conspirators direct by-pass access to the baggage loading area.  Donovan, cooperating co-conspirator, testified that defendant Dorival told him to take two flight tags to Brookes' office and that Donovan held kilogram quantities of cocaine in Brookes' office for Dorival.  Donovan Test. 118-19, Nov. 9. Donovan also testified that he pulled flight tags for Dorival and Gabriel, although he characterized the two as separate people doing their own thing, "moving drugs on the airport, differently."  Donovan Test. 231, 262, Nov. 9.  Donovan's lay characterization does not change the legal consequence of their cooperative action – conspiracy to smuggle drugs through the St. Thomas Airport whenever an occasion engaged the conspiracy's tentacles.

The testimony presented establishes that Dorival not only played a role in this conspiracy, but that he was an organizer and coordinator of the movement of bags containing cocaine through the airport using Brookes' office and/or the baggage room, as well as in the pulling of flight tags from legitimately checked luggage to place on bags containing cocaine.  A reasonable jury could infer from Dorival's actions that he had knowledge of and participated in the conspiracy.  Dorival's actions show beyond a reasonable doubt that there was a shared unity of purpose, an intent to achieve a common goal and an agreement to work toward the common goal of smuggling cocaine through the airport.

ii.     **Bernard Gabriel**

The Government presented evidence that Gabriel had knowledge of the various modi operandi used to smuggle cocaine through the airport, that his physical participation in the conspiracy was achieved through various acts, that he relied on the actions of other participants and that he had knowledge that he was part of a larger group.  Gabriel's own words, captured in Government Exhibit N-14, presented as a conversation taking place on July 16, 2004 between Gabriel and D. Rawlins, then cooperating with the Government, demonstrate that Gabriel was intimately familiar with the drug smuggling conspiracy charged in the indictment.  He had utilized it in the past, knew it was continuing, although cooled down, and planned to continue his participation in it to satisfy his greed for money:

| | |
|---|---|
| D. Rawlins: | Gabriel, what's up? |
| Gabriel: | I here. |
| D. Rawlins: | [no transcription] |
| Gabriel: | Right know the way dem man doing this thing you have to go through security.  You have to let all that simmer out.  Or else you going have the place smoke up.  Ain't going hold to long but you going have to . . . because they just send a . . . the port send out a memorandum to everybody so you have to see how that work before anybody try to make a move |
| D. Rawlins: | ahright |
| Gabriel: | ahright |

Gov't Ex. N-14.  D. Rawlins testified that, by his words, he intended to ask Gabriel whether any drugs could be smuggled through the airport.  D. Rawlins Test. 169, Nov. 15.  D. Rawlins understood Gabriel's response to mean that no drugs could go through the airport at that time.  D. Rawlins Test. 169, Nov. 15.  A further inference can be drawn from Gabriel's words that the only possible method of smuggled drugs involved going "through security."

Exhibit N-14, along with the other evidence submitted by the Government, including Donovan's testimony that he used to work for Gabriel by pulling flight tags and Brookes' testimony that he held shoe boxes on two occasions behind the Air Sunshine counter for Gabriel, compels the conclusion that the jury could have reasonably found that Gabriel understood that there was a conspiracy to move cocaine through the airport for profit and that he intended, by his actions, to join and use that conspiracy.

Although Brookes did not testify as to any personal knowledge as to what was contained in the shoe boxes, there is a reasonable inference, in light of the overwhelming evidence presented at trial, that the shoe boxes contained cocaine and that Gabriel, by asking Brookes to hold the boxes, was attempting to circumvent airport security measures to smuggle cocaine. Although it is possible that the shoe boxes held something other than cocaine, the elimination of all benign possibilities is not required. See Smith, 294 F.3d at 478. In reaching their verdict, the jury could have drawn the conclusion that the shoe boxes contained cocaine. This conclusion would have supported their finding that the essential elements of a conspiracy were established as to Gabriel beyond a reasonable doubt.

Finally, there was evidence that Gabriel acted as a look-out for Sylvester on March 10, 2004. On that date, Sylvester told Gabriel and R. Rawlins that he was going to pack two kilograms of cocaine into a suitcase, and Gabriel uttered words, "Do your own thing," that could have been found by the jury to have been assurances to Sylvester that Gabriel was his look-out. Donovan testified that look-outs were utilized at the airport to alert others when customs or other officials came into the baggage room. As discussed above, Donovan's characterization of Dorival and Gabriel as "moving drugs on the airport, differently" does not negate the other

evidence of a single conspiracy.

### iii.    R. Rawlins

The Government presented sufficient evidence to prove beyond a reasonable doubt that R. Rawlins participated in the conspiracy charged in Count I.  Cooperator testimony established that R. Rawlins pulled flight tags from checked luggage in the baggage room, that he removed unchecked bags containing cocaine that were tagged with flight tags belonging to checked luggage from Brookes' office, and that he asked Sylvester to get in touch with a drug supplier.  In addition to the evidence recited above, the court has also considered the evidence presented by the Government relative to the substantive charges on which R. Rawlins was convicted.  The Government produced substantial evidence which showed that not only did R. Rawlins have precise knowledge as to the exact modus operandi in place at the airport at any point in time, but that he physically participated in the conspiracy in multiple ways.  He pulled flight tags, picked up drug bags from Brookes' office, took bags to Brookes' office for storage and acted as a look-out.  Sylvester testified that he took a leave of absence from his employment sometime after he began his transactions with Thomas.  Sylvester Test. 42, Nov. 15. Upon Sylvester's return to work, R. Rawlins asked him, on multiple occasions, to get in touch with the cocaine supplier. Sylvester Test. 42, Nov. 15.

These actions and words are circumstantial evidence of an agreement by R. Rawlins to participate in the conspiracy.  From the same acts, a jury could reasonably infer that he knew that he was part of a large criminal venture and that he knew the object of that venture.  R. Rawlins' statements to Thomas during the August 30, 2004 recorded conversation serve to confirm his

knowledge of, intent to agree and participation in the conspiracy.  The conversation reflects R. Rawlins' familiarity with past methods of moving cocaine through the airport, which airlines and flight routes could be utilized, and current methods of moving cocaine, that is, that a bag needed to be checked in early and flight tags potentially switched.  He told Thomas how many units of cocaine could be moved at one time and that payment in cash was required.  R. Rawlins stated that he had worked "something" the previous Wednesday and that it went "straight," from which the jury could infer that cocaine was successfully moved through the airport, onto an airplane, and safely reached its destination on the mainland United States.  His advice to Thomas that "the best day to deal with that de is on a Wednesday" evidences a history of participating in this drug smuggling operation.  Gov't Ex. N-19.  R. Rawlins' statement that "We don't do US" shows that he worked with others to get cocaine onto airplanes and that they no longer, if ever, put cocaine on U.S. Airways flights.  Gov't Ex. N-19 (emphasis added).  He makes it clear that there is a system in place that utilizes the early arrival of passengers at the airport, whose checked luggage will be packed with cocaine in the baggage room or in the belly of the plane to avoid detection by authorities: "But the thing is right, yo got to be early. . . . As early as possible because that late thing don't cut it brother. . . . You goin be deh waiting, and it goin be off schedule, off schedule - the thing goin be up deh, and you down here still waiting, and then these man here might just pop out."  Gov't Ex. N-19.  R. Rawlins' stated plan to work with Thomas in the future in Sylvester's stead is evidence of R. Rawlins' intent to continue his participation in the drug smuggling conspiracy charged.

### iv.      Wilson

Although the quantity of evidence presented about defendant Wilson may have been less than some of the other defendants convicted of conspiracy, the quality of the evidence and whether it was sufficient to make out the elements of conspiracy beyond a reasonable doubt are the critical issues before the court.  It is apparent that the jury believed the testimony of the cooperators that attributes Wilson with actions showing his knowledge of the conspiracy and an agreement to join the conspiracy.

Wilson's own words show that he had knowledge of the modus operandi used to move cocaine through the airport that was in effect at a given point in time.  The Government presented Exhibit N-15, which was testified to be a conversation between Wilson and D. Rawlins taking place on August 24, 2004, who was cooperating with the Government at the time of the conversation:

| | |
|---|---|
| D. Rawlins: | Meson D-Mil you is a hard man to find Yo know |
| Wilson: | What's up. |
| D. Rawlins: | I been up here looking for you I see you they and you gone they..way you went too man |
| Wilson: | I just cooling bro . . . |
| D. Rawlins: | anyhow partner say I must check with you . . . |
| Wilson: | One at a time...you have to check the bag in though. |
| D. Rawlins: | One or two at a time? |
| Wilson: | It depends on how dem man pack it . . . I could I could do three but I can't, you know American.  I know somebody that can put two on and I can probably put three but they have to repack it and |

|            | they have to put it flat.  Make it flat . . . It have to be flat as possible.  Because you have to put it on your body. |
|------------|------------------------------------------------------------------------------------------------------------------------|
| D. Rawlins: | Alright, well I'll talk to you . . . |
| Wilson:     | It has to be flat like . . . |
| D. Rawlins: | Like St. Croix |
| Wilson:     | It has to be flat like that . . .crush it up and make it into powder, that's the only way right now |
| D. Rawlins: | Alright when I come back from St. Croix I will let you know. |
| Wilson:     | Alright . . . Man you have me on the main road like that with this tractor. |

Gov't Ex. N-15 (emphasis added).  A reasonable fact-finder could infer that Wilson was telling

D. Rawlins that two or three units of cocaine could be moved at a time, but not on American

Airlines, and that he knew another person who could assist him.  Wilson's statement, "It have to

be flat as possible.  Because you have to put in on your body," confirms his knowledge that the

modus operandi being used by the members of the conspiracy at the time was for an individual to

bring cocaine into the airport by packing it onto his body, and then having this cocaine packed

into a piece of checked baggage, confirmed by the statement "you have to check the bag in

though."[9]  This conversation showed that Wilson had knowledge of the specific modus operandi

in use at the airport at that given point in time, and that he knew of someone with whom he could

---

[9] The contemporaneous conversation between R. Rawlins and Thomas, captured in Gov't Ex. N-19, is another instance where the modus operandi of packing cocaine flat so that it can be placed on the body and then placed into a piece of checked baggage is discussed.  Both of those defendants exhibit a shared knowledge of the use of this method.  The jury could have reasonably concluded that this shared knowledge necessarily was only among co-conspirators.

work to accomplish the smuggling because other means had been foreclosed.  See Gov't Ex. N-15 ("I know somebody that can put two on"); see also Gov't Ex. N-15 ("It has to be flat . . . that's the only way right now").  Further, Brookes testified that he held bags for Wilson behind the Air Sunshine counter on three occasions, and received payment once.  Brookes Test. 75-78, Nov. 16.  Brookes testified that when Wilson left with the bags, he used the back door, which led to two locations, one of which was the ramp and baggage room.  Brookes Test. 76-78, 83, 182-84, Nov. 16.  Donovan testified that in July of an unknown year, he saw Wilson, an airplane mechanic, drive from the mechanic shop up to the baggage room and place a bag on the baggage belt.  Donovan Test. 132, Nov. 9.  Dorival then loaded this bag onto a baggage cart.  Donovan Test. 132, Nov. 9.  A reasonable jury could infer that Wilson intended to circumvent legitimate methods of checking in a bag, as well as airport customs, by bringing a bag from the mechanic shop directly to the baggage room, and that he relied on others to take care of the bag once he dropped it off.

From the evidence presented, a jury could have concluded that the Government proved the essential elements of conspiracy beyond a reasonable doubt as to Wilson.

### v.    Thomas

Conclusive evidence of Thomas' engagement in the drug conspiracy charged came out of his own mouth through recorded conversations with R. Rawlins.  Additionally, Thomas' statements give rise to the reasonable inference that he had previous continual drug smuggling contacts with various co-defendants and knew of their modus operandi in smuggling his cocaine through the airport.  He expressed knowledge of a "regular route" on Continental Airlines and

asked R. Rawlins if he would utilize that route.  Gov't Ex. N-19 ("[S]o you could work the regular route, what - like Continental?").  Beyond the recorded evidence, Sylvester's testimony establishes that Thomas supplied cocaine on multiple occasions to be moved through the airport, as well as cash to pay for that service and that he would contact Sylvester to let him know when the transaction was "blessed," that is, when the cocaine safely reached its destination.  Further, there is cooperator testimony suggesting that the transactions in which Thomas participated were standardized to a degree, yet remained flexible enough to change depending on the particular modus operandi being utilized by the baggage handler group at the airport during a particular period of time.  The extraordinary emphasis on silence and safety resounds through Thomas' words as recorded in Government Ex. N-19.

It is clear from Ex. N-19 that at the time of the August 30, 2004 meeting, Thomas acknowledged that he had been in the conspiracy for some time, using it to his advantage through Sylvester, and that he had knowledge of its purpose because he supplied the cocaine to be moved through the airport.  When Thomas asks R. Rawlins about what flights and airlines could possibly be utilized, and R. Rawlins answers "We don't do US," it is a reasonable inference that Thomas understood that a group of individuals at the airport worked to get his cocaine onto airplanes.  Thomas explains to R. Rawlins that the methods of moving and secreting cocaine can change, and that he would rely on R. Rawlins, as he had relied on Sylvester in the past, to keep him abreast of the safety of the venture and the modus operandi currently in use by the group.  Gov't Ex. N-19.

Having reviewed the evidence submitted at trial in a light most favorable to the Government, the court concludes that the Government submitted sufficient evidence such that a

reasonable jury could have found that the Government proved each essential element of the crime of conspiracy beyond a reasonable doubt as to each defendant who was convicted of conspiracy under Count I of the Superseding Indictment.

### 2.      Gabriel and Wilson's Variance Arguments as to Count I.

Defendants Gabriel and Wilson argue that if the Government proved any conspiracy, it proved multiple conspiracies and that, consequently, there exists a variance between the single conspiracy as charged in the indictment and proof at trial.  Defendants ask that their Rule 29 and Rule 33 motions be granted on this basis.

Under the variance doctrine set forth in Kotteakos v. United States, 328 U.S. 750 (1946), a conviction must be vacated when (a) there existed a variance between the indictment and proof at trial, and (b) this variance exists to the prejudice of a defendant's substantial rights.  See United States v. Salmon, 944 F.2d 1106, 1116 (3d Cir. 1991) (citing United States v. Kelly, 892 F.2d 255, 258 (3d Cir. 1989), cert. denied, 497 U.S. 1006 (1990)), cert. denied sub nom., Washington v. United States, 502 U.S. 1110 (1992).  A variance of proof exists if a single conspiracy has been alleged and the evidence shows multiple conspiracies.  Id.  The variance doctrine is intended to protect a defendant's "right not to be tried en masse for the conglomeration of distinct and separate offenses committed by others."  Id. (internal citations omitted).  The doctrine recognizes that in certain instances, a "jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another."  United States v. Camiel, 689 F.2d 31, 38 (3d Cir. 1982).

The issue, however, of "whether a single conspiracy or multiple conspiracies exist is a

fact question to be decided by a jury."  United States v. Perez, 280 F.3d 318, 345 (3d Cir. 2002),

cert. denied, 537 U.S. 859 (2002).  Thus, the task before the court is to determine whether,

reviewing the evidence in a light most favorable to the Government, a reasonable jury could find

that a single conspiracy existed as charged.  See, e.g., Salmon, 944 F.2d at 1116; Kelly, 892 F.2d

at 258.  The Third Circuit has articulated a three part inquiry for consideration in this

determination: (1) whether there was a "common goal among the conspirators;" (2) "the nature of

the scheme to determine whether the agreement contemplated bringing to pass a continuous

result" that was unable to continue "without the continuous cooperation of the conspirators;" and

(3) the "extent to which the participants overlap in the various dealings."  Salmon, 944 F.2d at

1116 (citing Kelly, 892 F.2d at 259).

    This court finds that all three steps of this variance inquiry support the jury's finding that

there existed a single conspiracy.  First, a common goal existed among the conspirators to

smuggle drugs through the airport without detection by customs or other authorities for profit.

Second, the agreement among the individuals contemplated bringing to pass a continuous result

that was unable to continue without the continuous cooperation of the conspirators.  Finally, the

consistent use of specific methods to move drugs through the airport through the baggage room

and Brookes' office provided adequate overlap.  The utilization of common modi operandi, and

the manner in which different roles (pulling flight tags, storing bags, serving as a lookout) fit

together to successfully move cocaine from outside of the airport onto airplanes shows extensive

overlap and reliance of the participants upon one another.  Again, "the government need not

prove that each defendant knew all the details, goals, or other participants" in order to find a

single conspiracy, but does need to show that a defendant knew that "he was part of a larger drug

operation."  United States v. Padilla, 982 F.2d 110, 114 (3d Cir. 1992) (internal quotations and citations omitted).

Defendants argue that because the Government originally charged defendant Edinborough in the conspiracy count, and presented evidence in an attempt to prove such, despite the Government's dismissal of Edinborough from the conspiracy count, there existed a variance between the single conspiracy alleged in the superseding indictment and the proof at trial.

Following the Government's case-in-chief, each defendant made an oral motion for acquittal on the conspiracy count.  After arguments on the motions, and a discussion of conspiracy case law, the Government conceded that no evidence linked alleged drug supplier Thomas with alleged drug supplier Edinborough.  Trial Tr. 15, Nov. 20, 2006.  The Government further conceded that "the evidence as adduced at trial does establish the existence of two separate conspiracies."  Trial Tr. 5, Nov. 21, 2006.  The court declined, in the face of those concessions, to charge the jury on the conspiracy charge as it appeared in the Superseding Indictment, and told the Government that it could elect to dismiss an alleged smuggler prior to the court's ruling on the individual motions for acquittal.  Trial Tr. 142, 146, Nov. 20.  While the Government asked the court to submit Count I to the jury, the court declined because "[t]here would be a risk of confusion where you have clearly . . . two separate independent smuggler actors because the jury could infer upon Mr. Edinborough Mr. Alric Thomas's intentions or actions, the words, to Edinborough's prejudice."  Trial Tr. 14, Nov. 21.

The Government then elected to dismiss Edinborough from Count I.

In preliminary instructions to the jury, the court told the jury that Edinborough was no longer charged in the conspiracy count, Count I, of the Superseding Indictment, as the result of a

legal ruling by the court.  The court also told the jury that it could make no inference that Edinborough was guilty or innocent of anything associated with Count I.  Further, the court told the jury that it may not infer guilt or innocence as to any other defendant charged in the conspiracy count from the fact that Edinborough was no longer in the count.  Trial Tr. 14, Nov. 28, 2006.

The Government's concession that it produced no facts linking defendants Thomas and Edinborough means that there was not adequate evidence to prove that Edinborough was a chargeable member of the conspiracy charged in the Superseding Indictment.  Even if there existed a variance between the Government's proof at trial and the conspiracy charged by the Government, the court finds that there was absolutely no prejudice to the substantial right of any defendant as a result.  There certainly was none as to Edinborough, as he was dismissed from the conspiracy charge.  He specifically elected to remain in the trial as a defendant rather than have a separate trial on charges remaining against him.  Trial Tr. 4, 13, November 20 (Edinborough withdraws Motion for Severance).  There was no danger of prejudicial spillover.  The evidence presented by the Government established the existence of a core group of airport employees who were available to utilize the facilities of the airport to smuggle cocaine.  As has been discussed, there was irrefutable proof that Thomas had utilized this core group through Sylvester to smuggle his cocaine.  Further, the court gave the jury specific instructions that it was not permitted to draw any adverse inference as to any other defendant because Edinborough was no longer charged in the conspiracy count.

Defendants' additional arguments, separate from those involving Edinborough, are not sufficient to establish a variance between the single conspiracy charged to the jury and the proof

at trial.

### 3.    Count VI: Dorival, R. Rawlins and Thomas.

In Count VI of the Superseding Indictment, the Government charges defendants Dorival, R. Rawlins and Thomas with the following: "[O]n or about September 20, 2003 on St. Thomas, the defendants did knowingly and intentionally, aiding and abetting each other, Dion Brookes and Meleek Sylvester, possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine."

A conviction of possession with intent to distribute a controlled substance "requires that one knowingly and intentionally possessed the substance with the intent to distribute it." Salmon, 944 F.2d at 1113 (citing United States v. Martorano, 709 F.2d 863, 866 (3d Cir. 1983), cert. denied, 464 U.S. 993). An aiding and abetting conviction requires that another individual committed the substantive crime and that the defendant knew of the crime and "acted with the intent to facilitate it." Salmon, 944 F.2d at 1113 (citing United States v. Dixon, 658 F.2d 181, 189 n.17 (3d Cir. 1981)). Further, acting with intent to facilitate a substantive offense requires that the defendant acted with the "intent to help those involved with a certain crime." United States v. Wexler, 838 F.2d 88, 92 (3d Cir. 1988) (emphasis added).

The Government presented sufficient evidence to uphold the convictions of Dorival, R. Rawlins and Thomas. On September 20, 2003, fifty kilograms of cocaine were seized from two suitcases at the airport. Darnell Blake Test., Trial Tr. 82, Nov. 8, 2006; Louis Penn, Jr. Test., Trial Tr. 80, Nov. 17, 2006. The night before this seizure, Thomas and Sylvester met. Sylvester Test. 176, Nov. 13. Thomas provided to Sylvester three bags that contained cocaine. Sylvester

Test. 176, Nov. 13.  After the meeting, Sylvester called Dorival and asked him to pick up

Brookes the following morning and bring him to the airport.  Sylvester Test. 176, Nov. 13.

On September 20, 2003, Brookes held two bags for R. Rawlins, which Sylvester had

brought to the airport.  Brookes Test. 86, Nov. 16.  Dorival directed Donovan to get two flight

tags and take them to Brookes office.  Donovan Test. 118-19, Nov. 9.  Donovan removed the

flight tags for these bags.  Donovan Test. 118, Nov. 9.  Then, either R. Rawlins or Donovan took

these flight tags to Brookes' office.  Donovan Test. 118, Nov. 9; Brookes Test. 86, Nov. 16.  In

Brookes' office, R. Rawlins or Brookes placed these flight tags on the bags.  Brookes Test. 86,

Nov. 16.  R. Rawlins then took the bags and exited through the back door of Brookes' office.

Brookes Test. 86, Nov. 16.  R. Rawlins placed these bags on the belt in the baggage room.

Donovan Test. 119, Nov. 9.

On that same day, another airport employee[10] found two bags without any flight tags on a

baggage cart and contacted authorities.  Donovan Test. 118, 122, Nov. 9.  Donovan testified that

Dorival was supposed to throw away the two bags from which flight tags had been removed, but

did not.  Donovan Test. 120, Nov. 9.  Sylvester learned from Dorival that two of the bags that

Sylvester brought to the airport had been seized by TSA and that one remained in Brookes'

office.  Sylvester Test. 181-82, Nov. 13.  Upon hearing this, Sylvester contacted R. Rawlins, and

told him that a bag containing ten kilograms of cocaine remained in Brookes' office, and asked

him to pick it up.  Sylvester Test. 184, Nov. 13.  R. Rawlins agreed to do so.  Sylvester Test. 185,

Nov. 13.  R. Rawlins then obtained the bag and gave it to Sylvester.  Sylvester Test. 185-86,

Nov. 13.  Sylvester took this remaining bag containing the ten kilograms of cocaine and the

---

[10] Don Donovan is the employee who located these two bags.

$60,000.00 back to Thomas.  Sylvester Test. 187-88, Nov. 13.

Approximately two weeks after their September 19th meeting, Thomas told Sylvester that there was a seizure of cocaine at the airport because two bags without tags were found.  Sylvester Test. 188, Nov. 13.

The Government's evidence , if believed, clearly established that these defendants possessed the cocaine with intent to distribute, and that they aided and abetted each other in doing so.  Thomas' actions established that he knowingly and intentionally possessed cocaine with the intent to distribute it.  Dorival's actions in picking up Brookes, and his direction to Donovan to pull flight tags and take them to Brookes' office, in light of this evidence recited and other evidence presented by the Government as to Dorival's knowledge of the use of Brookes' office as well as Dorival's knowledge of the nature of the meetings between Sylvester and Thomas, lead to the reasonable inference that he acted with the intent of facilitating the specific crime of possession of cocaine with intent to distribute that was committed by another individual.

Finally, with respect to R. Rawlins, a jury could have drawn a reasonable inference from his actions that he had knowledge that the bags being stored in Brookes' office contained cocaine, and that, by bringing tags to Brookes' office and either tagging the bags himself or providing them to Brookes for tagging, R. Rawlins intended to assist in smuggling cocaine through the airport and onto an airplane and to facilitate the substantive crime of possession of cocaine with intent to distribute.  In addition, R. Rawlins' retrieval of the third bag from Brookes' office and giving it to Sylvester further supports the reasonable inference that he wanted to ensure that the bag of cocaine was not detected by authorities following the seizure of cocaine from the other two bags so as to protect Sylvester, Brookes and himself.

Page 44 of  85

4.      **Count VII: R. Rawlins.**

In Count VII of the Superseding Indictment, the Government charges R. Rawlins with the following: "[T]hat on or about November 8, 2003, on St. Thomas, Robert Rawlins did knowingly and intentionally, aided and abetted by Dion Brookes, possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine."

The Government presented sufficient evidence to uphold R. Rawlins' conviction on this count.  On November 8, 2003, there was a seizure of cocaine at Newark International Airport from Continental Flight 1902 arriving from St. Thomas.  Gregory Reardon Test., Trial Tr. 145-46, 157-58, Nov. 17, 2006.  On this date, Donovan, who was cooperating with the Government, saw R. Rawlins pull a Continental Airlines flight tag with a destination of Newark, New Jersey from a bag, put this flight tag in his pocket, go toward Brookes' office and return with a blue bag, which he placed on a baggage belt.  Donovan Test. 134, Nov. 9.  Donovan then called Agent Blake, a federal agent with whom he had had contact, and shared his observations.  Blake Test. 87, Nov. 8; Donovan Test. 134, Nov. 9.  Agent Blake contacted agents in Newark and told them of his belief that there was a blue suitcase placed on Continental Flight 1902, destination Newark International Airport, that needed to be searched after the airplane landed.  Blake Test. 91, 93, Nov. 8.  After the flight from St. Thomas arrived at Newark International Airport, customs inspectors conducted a search of each item of checked baggage aboard Flight 1902 and discovered a suitcase containing cocaine.  Reardon Test. 145, Nov. 17; Bradley Benwell Test., Trial Tr. 157-58, Nov. 17, 2006.

A reasonable inference was capable of being drawn that the blue bag that Donovan saw

R. Rawlins bring into the baggage room was the same bag that contained the cocaine seized in Newark, New Jersey.  Having established that R. Rawlins had had possession of the bag containing cocaine, having put it through Brookes' office, it is a reasonable inference from his actions that he knew the bag possessed cocaine, and that he had knowingly and intentionally possessed that cocaine with the intent to distribute it.

###     5.       Count VIII: Dorival and Edinborough.

In Count VIII of the Superseding Indictment, the Government charges defendants Dorival and Edinborough[11] as follows: that "on or about November, 2003, on St. Thomas, the defendants and others known and unknown to the grand jury, did knowingly and intentionally aiding and abetting each other and Danny Rawlins, possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine."

A seizure of cocaine occurred on November 19, 2003 at the Miami International Airport on a flight arriving from the St. Thomas Airport.  In their post-trial motions, Defendants Dorival and Edinborough do not move for acquittal pursuant to Rule 29 on this substantive count.  To the extent that their Motions for New Trial can be construed as such a motion, those are denied.  The court finds that the Government provided sufficient evidence as to this count.  D. Rawlins, a porter at the airport, testified that he met with Edinborough, who gave him a bag containing cocaine.  D. Rawlins understood that he was supposed to take that bag to the airport to give to Dorival, and he did so.  Donovan testified that he called federal agents and notified them that a bag containing drugs would be on a morning flight destined for Miami after he knew Brewley

---

[11] Roy Brewley was also originally charged in this count, but the court declared a mistrial as to Brewley only.

had possession of flight tags and D. Rawlins asked him whether Dorival was working. Donovan Test. 134-35, Nov. 9.

The testimony of D. Rawlins and Donovan is sufficient such that a rational jury could have found proof beyond a reasonable doubt as to the essential elements of the crime charged for both Dorival and Edinborough, even though no cooperating witness was asked to identify the bag seized in the Miami airport. A reasonable inference could have been drawn, based on all of the relevant evidence, that the bag containing cocaine seized in Miami was the same bag Edinborough gave to D. Rawlins.

### 6.    Count X: R. Rawlins

R. Rawlins seeks acquittal on Count X of the Superseding Indictment, which charges him with the following: "On or about February 21, 2004, on St. Thomas, Robert Rawlins did knowingly and intentionally, aided and abetted by Dion Brookes, possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine."

On February 21, 2004, Donovan contacted the federal agents with whom he was cooperating and told them that he was obtaining flight tags for a Continental flight to Newark, New Jersey for Brookes. Donovan Test. 138-39, Nov. 9. Donovan originally pulled two tags but, when he took them to Brookes' office, Brookes told him only one was needed. Donovan Test. 139, Nov. 9. Donovan returned to the baggage room to put the tag back on the passenger's bag on which it belonged. Donovan Test. 139, Nov. 9. After Donovan returned to the baggage room, he saw R. Rawlins come from the direction of the Air Sunshine baggage belt, carrying bags into the baggage room. Donovan Test. 139, 244, Nov. 9.

On the same day, there was a seizure of cocaine at the airport in St. Thomas from a bag that was going to be placed on Continental Flight 1902, heading to Newark, New Jersey.  Blake Test. 98-99, Nov. 8.

The evidence establishes that the substantive crime was committed by Brookes.  A jury could conclude that at least one of the bags Donovan saw R. Rawlins carry into the baggage room had been held in Brookes' office and contained cocaine.  Further, it is a reasonable inference that R. Rawlins knowingly and intentionally possessed cocaine in the bags he carried with intent to distribute it.  At the very least, a jury could have concluded that R. Rawlins' actions were intended to facilitate the commission of this specific substantive crime.

The court concludes that the Government presented sufficient evidence of the actions of R. Rawlins and others from which a jury could conclude that R. Rawlins was guilty of this count.

### 7.    Count XI: Gabriel, R. Rawlins and Thomas.

In Count XI of the Superseding Indictment, the Government charges defendants Gabriel, R. Rawlins and Thomas with the following: "On or about March 10, 2004, on St. Thomas, the defendants did knowingly and intentionally, aiding and abetting each other and Meleek Sylvester, possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine."

Sylvester testified that he met with Thomas on March 10, 2004.  Sylvester Test. 189-90, Nov. 13.  During this meeting, Thomas gave Sylvester two kilograms of cocaine and $4,000.00 in payment.  Sylvester Test. 190, Nov. 13.  Sylvester put the cocaine in his lunch box.  Sylvester Test. 190, Nov. 13.  At this meeting, Thomas explained that Sylvester would give the two

kilograms of cocaine to another individual who would transport, on his person, the cocaine into the belly of the plane, where it would be placed into a green bag that would be checked-in by a woman.  Sylvester Test. 190-194, Nov. 13.  Thomas showed Sylvester the green bag so that he could recognize it when it came down the conveyor belt in the baggage area.  Sylvester Test. 191, Nov. 13.  Thomas gave Sylvester a gold lock to lock the bag after the two kilograms of cocaine were placed in the bag in the belly of the plane.  Sylvester Test. 191, Nov. 13.

The next day, Sylvester took the cocaine to the airport in his lunch box and, around 11:30 a.m., placed one kilogram of cocaine in his waist and another in the pocket of the apron that he wore.  Sylvester Test. 192, Nov. 13.

Next, Sylvester contacted the individual to whom he was supposed to give the cocaine, R. Rawlins.  Sylvester Test. 192, Nov. 13.  R. Rawlins told him that since the female passenger had not yet checked in the bag, it was "too late" and he would not load the cocaine.  Sylvester Test. 192-93, Nov. 13.  Sylvester testified that R. Rawlins had arranged the transaction, but R. Rawlins was not the individual who met Thomas to pick up the cocaine.  Sylvester Test. 193, Nov. 13.

Unable to reach Thomas, Sylvester asked R. Rawlins to look out for him while he placed the cocaine into a bag.  Sylvester Test. 193-94, Nov. 13.  Sylvester elaborated that he told R. Rawlins and Gabriel that he was going to put two kilograms of cocaine into a green bag, and they responded "Go ahead.  Do your thing."  Sylvester Test. 206, Nov. 13.

On this same date, there was a seizure of a bag containing cocaine at Newark International Airport from Continental Flight 1902, arriving from St. Thomas.  Michael Perreaul Test., Trial Tr. 152-53, Nov. 17, 2006.

The court finds that the Government presented sufficient evidence as to this count for

each of the named defendants.  Sylvester's testimony establishes that he committed the substantive crime of possession of cocaine with intent to distribute.  Thomas' actions in bringing the cocaine to the meeting with Sylvester and the passing of it to Sylvester along with cash and directions clearly meet the elements of the substantive crime of possession with intent to distribute.

With respect to R. Rawlins and Gabriel, both were made aware by Sylvester that he was packing two kilograms of cocaine into a piece of luggage.  Their response "Do your thing" gave rise to the reasonable inference that they were telling Sylvester that they were acting as his look-outs as he hid cocaine into the small piece of luggage.  Rather than a mere failure to act, the words and actions of R. Rawlins and Gabriel could have been reasonably understood by the jury as affirmative actions to facilitate the safe smuggling of drugs through the baggage room, through the airport, and onto an airplane heading to the mainland.

R. Rawlins' refusal to take the cocaine from Sylvester and pack it into a suitcase himself, as Sylvester testified was the original plan between them, does not negate his agreement to act as a look-out for Sylvester or his having arranged the transaction and his having been on the watch for the female who was supposed to check the luggage in timely for the transfer of cocaine to be done without the risk of detection.  R. Rawlins, by his own words, assured Sylvester that he would be safe to "[d]o [his] thing."  Even if R. Rawlins got "cold feet" in the baggage room, his prior actions evidenced intent to cause the criminal venture to succeed and, in fact, the cocaine, by his efforts, had succeeded in coming into the airport for interstate distribution.

Finally, R. Rawlins argues that the court's denial of his oral Rule 29 motion on this count was erroneously based on a finding that R. Rawlins, as an employee of the airport, had a duty to

report illegal activity because they were placed in a position of trust with baggage due to their employment at the airport.  R. Rawlins' Mem. of Law in Supp. Mot. New Trial 4.  The court did make this point, but did not rely on it in finding that the Government presented sufficient evidence as to both R. Rawlins and the Government to withstand the Rule 29 motion.  Nor did the Government argue this "duty" in its closing.  However, the court still abides by the observation made to defendants that the circumstantial evidence established that the baggage handlers' duties as to checked bags were not to alter them or to turn a blind eye to destruction or criminalization of passengers' luggage.  These were employees of the airport occupying positions of trust and, therefore, could have been found not to be mere passers-by or mere witnesses to criminal action occurring in the baggage room or otherwise handling luggage entrusted to the protection of the Airport and the Port Authority.  The jurors were charged that they were expected to use their common sense.

Having viewed the Government's evidence regarding this count in a light most favorable to the Government, the court concludes that a rational jury could have found proof of guilt beyond a reasonable doubt based on the evidence.

The court concludes that sufficient evidence supports the jury's verdict of guilt as to each count, for each defendant.  The Rule 29 motions for acquittal are denied.

### III.   RULE 33 MOTIONS FOR NEW TRIAL

Each of the above-captioned defendants has filed, either primarily or in the alternative, a motion for new trial pursuant to Fed. R. Crim. P. 33.  To the extent that any defendant has moved to adopt the arguments of other defendants, the court grants such a motion, and will consider all

arguments made as if made by each defendant as appropriate.  The court, however, will continue to refer to the specific defendant who advances and argues specific grounds.

### A.      Rule 33 Standard

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Grounds for a new trial may include prosecutorial misconduct, as well as a finding by the trial court that the evidence does not support the jury's verdict.  United States v. Dixon, 658 F.2d 181, 193 (3d Cir. 1981).  When the court evaluates a Rule 33 motion, unlike an insufficiency of the evidence claim under Rule 29, it does not view the evidence in a light most favorable to the government, but "instead exercises its own judgment in assessing the Government's case." United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002), cert. denied, 537 U.S. 1140 (2003). This court can "order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted."  Johnson, 302 F.3d at 150 (internal quotations and citations omitted).

Further, should a defendant seek a new trial on the basis of newly discovered evidence, he has the burden of establishing several factors:

> (a) the evidence must be in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006).

Finally, the court notes that "a defendant is entitled to a fair trial but not a perfect one." Lutwak v. United States, 344 U.S. 604, 619 (1953), reh'g denied, 345 U.S. 919 (1953).

**B.      Arguments**

Defendants have set forth multiple grounds that they argue warrant the grant of a new trial, and the court will consider each in turn, below.

**1.      Evidentiary Errors**

Gabriel argues that the court erroneously admitted certain testimony and exhibits at trial and that a new trial should be ordered as a result.  The court stands by any evidentiary rulings made at trial for the reasons provided at the time, and finds that this argument does not provide a basis for new trial.

**2.      Prosecutorial Misconduct**

Defendants argue that prosecutorial misconduct throughout the trial deprived them of their substantive rights to a fair trial, and warrants the granting of a new trial.  The Supreme Court has recognized that prosecutorial misconduct may "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  To warrant the grant of a new trial, such misconduct must constitute a "'failure to observe that fundamental fairness essential to the very concept of justice.'"  Id. at 642 (quoting Lisenba v. California, 314 U.S. 219, 236 (1941), reh'g denied, 315 U.S. 326 (1942)).  Any

allegedly improper remarks must be considered in the context of the entire trial to determine whether they "were sufficiently prejudicial" to the due process rights of any defendant.[12]  United States v. Scarfo, 685 F.2d 842, 849 (3d Cir. 1982), cert. denied, 459 U.S. 1170 (1983).  The court will examine each area of alleged prosecutorial misconduct individually as well as collectively to determine whether, in the context of the trial as a whole, there was such misconduct so as to infect the trial with unfairness.  Defendant Gabriel advances the majority of the arguments alleging prosecutorial misconduct, in which the other defendants join.

> **a.**     *Government's Opening Statement*

Gabriel argues that the Government misstated the law of conspiracy and impermissibly advanced conclusions of ultimate fact in its opening statement.  The cited incident was stricken by the court upon objection of defense counsel.  Further, the jury was charged throughout the trial and in the final charge that opening statements of counsel were not evidence, and that the court would provide the charge of the law that the jury should follow.  There was no prosecutorial misconduct in the Government's opening statement that requires the grant of a new trial as to any defendant.

> **b.**     *Government's Case-in-Chief*

Gabriel argues the Government's case-in-chief was plagued with prosecutorial misconduct.  He first alleges that the Government failed to timely provide him with the

---

[12] The Third Circuit has differentiated "between prosecutorial remarks regarding the defendant's guilt or a witness's credibility that are based on the evidence and those that are based on information outside of the record. . . . [T]he latter constitute reversible error per se, but the former are grounds for new trial only if the defendant was prejudiced by the remarks."  United States v. Swinehart, 617 F.2d 336, 339 (3d Cir. 1980).  No defendants allege that the prosecutor made any comments falling into the latter category.

confidential source agreements for the cooperating co-conspirators.  Gabriel has failed to

articulate how he, or any other defendant, was prejudiced by any delay in the provision of

materials to which he was entitled.  The court finds that there was no such prejudice to the

defendants, and that defendants' argument that this constitutes a Brady violation is without merit.

See Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Brady v. Maryland, 373 U.S. 83 (1963).

In a related argument, Gabriel alleges that the Government failed to provide to him before trial a

list of cooperating co-conspirator Sylvester's assets.  Again, Gabriel asserts this argument with

no explanation as to how any delay prejudiced his ability to perform an effective cross-

examination or prejudiced any other substantive right so as to deprive him of a fair trial.

Second, Gabriel argues that the Government improperly introduced evidence under

Federal Rule of Evidence 404(b) when Donovan testified that he stopped working for Gabriel

removing flight tags after Gabriel paid him with a counterfeit one-hundred dollar bill.  See

Donovan Test. 129, Nov. 9.  Counsel for defendant Gabriel objected at the time of trial, which

objection the court overruled.  This is not prosecutorial misconduct, but the introduction of

evidence for a permissible purpose, including proof of plan or knowledge, as provided by the

federal rules of evidence.

Third, defendant Gabriel argues that the Government asked improper, leading and

confusing questions throughout its examinations of witnesses that suggested responses or were

testimonial.  With respect to any question or remark that was objected to by defense counsel and

sustained, and/or stricken by the court, the court finds that these improper questions or comments

by the prosecutor do not rise to the level of prejudicial misconduct.  The court instructed the jury

on multiple occasions that questions and answers that were objected to were not to be considered

as evidence when the objection was sustained or when a question or answer was stricken.  It is presumed that "the jury will follow a curative instruction unless there is an overwhelming probability that the jury will be unable to follow it and a strong likelihood that the effect of the evidence would be devastating to the defendant."  United States v. Newby, 11 F.3d 1143, 1147 (3d Cir. 1993) (internal citations omitted), cert. denied sub nom. Barber v. United States, 511 U.S. 1087 (1994), and cert. denied, 513 U.S. 834 (1994).  No example cited by any defendant is of such a nature that the jury would not be able to follow the court's general and curative instructions.  Defendant Gabriel chooses to select as examples only instances in which the court sustained an objection to the Government's question or remark, but argues that the Government's questions or remarks, to which counsel's objections were overruled, require the grant of a new trial.  Gabriel Mem. Law in Supp. Renewed R. 29 Mot. for J. of Acquittal or Alt. R. 33 Mot. New Trial 38.  The court has reviewed the record as a whole, but will not canvass the record looking for support for Defendant's argument when he himself provides none.  Defendant has failed to meet his burden.

Fourth, defendant Gabriel argues that the Government improperly had prejudicial physical evidence, including suitcases alleged to have contained narcotics, labeled, published to the jury and left in the view of the jury.  Defendant's "argument" on this point is limited to a one sentence heading with a citation to three pages of the trial transcript.  The trial court handled this issue by consulting with counsel at sidebar during trial.  See Trial Tr. 106-109, Nov. 9, 2006.

The conduct of the prosecutor during the Government's case-in-chief does not warrant the granting of a new trial.

### c.       *Government Closing Argument and Rebuttal Argument*

Defendant Gabriel argues that the Government's entire closing argument constituted prosecutorial misconduct.  Specifically, Gabriel argues that the Government misstated facts in evidence, assumed facts not in evidence and mischaracterized evidence; made improper statements of personal opinion; improperly vouched; and made improper arguments.  To the extent that the court sustained objections to statements by the prosecutor, the court's general and curative instructions to the jury to disregard such statements were sufficient to protect defendant's substantial rights.  Further, to the extent that any defendant's objection was overruled by the court, the court's instructions to the jury that it was their responsibility to recall the evidence in the case and that closing arguments by counsel were not evidence in the case were sufficient to protect defendants' substantial rights, if any of the prosecutor's statements were improper.

With respect to Gabriel's specific argument that the prosecutor launched a deliberate, personal attack against his defense counsel, the court finds that there was no prejudice to any defendant's substantive right to a fair trial resulting from the prosecutor's remarks in response to defense counsel's closing argument.  When defense counsel objected to the Government's argument, the court either overruled the objection with the instruction to the jury that the jury would recall the argument or directed the Government to limit its argument to the evidence.  During a sidebar conference, the court directed the prosecutor to refrain from any argument that could be perceived by defense counsel as a personal attack.  Trial Tr. 42-45, Nov. 30, 2006.

Finally, Gabriel argues that the Government's reading of portions of the transcript prejudicially permitted the Government to present its entire case-in-chief a second time.  The

Government did not present its case-in-chief a second time.  Most importantly, defense counsel made multiple objections that the prosecutor's recollection of the testimony was faulty and requested, numerous times, that the prosecutor cite to or read from transcripts of the testimony. The court then directed all counsel to utilize the transcripts, which were ordered to be fully transcribed and made available to all parties.  Further, prior to closing arguments, counsel for defendant Thomas asked about the court's policy with respect to reading from the trial transcripts, and the court indicated, with no objection from any party, that counsel could read from the transcripts.[13]  Trial Tr. 104, Nov. 27, 2006.  Although Gabriel argues that he was deprived of the "equal opportunity for re-reading of cross-examination," he fails to include one single citation from the record to support that proposition.

     In sum, the jury is presumed to have followed the court's general and curative instructions.  The court finds that there was no prosecutorial misconduct during the Government's closing and rebuttal arguments that compromised any defendant's right to a fair

---

[13]

| MR. THOMAS: | Do you allow the attorneys in closing arguments to actually read from the transcript?  Some judges do not.  Some judges may allow it.<br>I'd like to know what is this Court's policy in reading from the transcript as to what we – some judges say no, use it as your notes, as what you recall. |
| --- | --- |
| THE COURT: | If there is something that somebody said, you may read it. |
| MR. THOMAS: | Directly from the transcript? |
| THE COURT: | Yes, sir. |
| MR. THOMAS: | Thank you. |

Trial Tr. 104, Nov. 27, 2006.

trial.

### d.    *Targeting of Defense Counsel*

Gabriel argues that his Sixth Amendment right to effective assistance of counsel was compromised by the prosecutor's personal attacks on defense counsel.  The court finds that no statements or remarks of the prosecutor denied any defendant his rights as guaranteed by the Sixth Amendment.

### e.    *Government's Presentation of Evidence Regarding Defendant Dorival*

Dorival argues that prosecutorial misconduct deprived him of his right to a fair trial and that as a result, he is entitled to a new trial.  Dorival's argument concerns the evidence the Government presented in an attempt to prove Counts II and IV of the Superseding Indictment, which the court dismissed at trial upon Dorival's motion for acquittal.  Dorival argues that the Government made intentional misrepresentations to the court, over the objections of defense counsel, that the evidence it sought to present as to seizures of cocaine taking place on July 13, 2002 and May 17, 2003 was relevant to the testimony of cooperating co-conspirator Donovan.

The court finds that any misstatement made by the Government concerning the relevance of evidence as to Counts II and IV and the substance of Donovan's testimony was inadvertent. Dorival suffered no prejudice from the admission of evidence concerning seizures on July 13, 2002 and May 17, 2003 because the court granted Dorival's Rule 29 motion with respect to Counts II and IV, and instructed the jury that it could consider as evidence only that which was offered by the Government to support the remaining claims against that defendant.  As discussed above, the Government presented sufficient evidence of Dorival's involvement in the conspiracy charge and substantive counts of which he was convicted.  The court finds, therefore, that

stricken evidence of cocaine in passenger bags did not result in any unfair prejudice.

Having considered all arguments of prosecutorial misconduct as a whole and reviewing the record in its entirety, the court finds that each defendant received a fair trial and that the conduct of the prosecutor throughout the entirely of the trial did not so infect the trial with unfairness such that the convictions were the result of a denial of due process.

### 3.      Judicial Misconduct

Defendants also seek a new trial on the basis of judicial misconduct, alleging that the trial judge interfered with the trial in such a way as to convey allegiance with the Government, denying defendants' right to a fair trial.  Edinborough argues that the court impermissibly instructed the Government to dismiss him from the conspiracy count in order to avoid granting the oral Rule 29 motions for acquittal on that count by all other charged defendants. Edinborough further argues that the court improperly permitted the Government to read portions of the trial transcripts during its closing argument.  Thomas argues that the court erred when it interrupted his counsel's opening statement to the jury.  Finally, Edinborough argues that the court failed to maintain impartiality in its final instructions to the jury regarding their deliberations as to amount, as well as during the post-trial hearing held to investigate allegations of jury misconduct.  The court finds that these arguments do not provide a basis for the grant of a new trial.

The role of a trial court judge permits the active involvement of the judge during trial because "a trial is not a contest but a search for the truth so that justice may properly be administered."  United States v. Beaty, 722 F.2d 1090, 1093 (3d Cir. 1983) (citing Riley v.

Goodman, 315 F.2d 232, 234 (3d Cir. 1963)).  A trial judge is more than a "mere moderator" or

"umpire" in the trial.  United States v. Wilensky, 757 F.2d 594, 597 (3d Cir. 1985) (citations

omitted).  Federal Rule of Evidence 614(b) permits a court to "interrogate witnesses, whether

called by itself or by a party."  Fed. R. Evid. 614(b).  "For the purpose of eliciting the germane

facts, a judge may on his own initiative and within his sound discretion interrogate witnesses. . . .

In our federal system the trial judge has the duty to discover the truth, elicit material facts, clarify

testimony, and expedite the trial as much as possible."  Riley, 315 F.2d at 234-35 (emphasis

added) (internal citations omitted).  There are limitations on the role of a trial judge, however, for

a judge "must not abandon his proper role and assume that of an advocate."  Wilensky, 757 F.2d

at 597 (internal quotations and citations omitted).  Federal Rule of Evidence 611(a) provides, in

relevant part:

> The court shall exercise reasonable control over the mode and
> order of interrogating witnesses and presenting evidence so as to
> (1) make the interrogation and presentation effective for the
> ascertainment of the truth, (2) avoid needless consumption of time,
> and (3) protect witnesses from harassment or undue
> embarrassment.

Fed. R. Evid. 611(a).

"[I]n order to reverse on the grounds of excessive judicial intervention, the record must

either disclose actual bias on the party of the trial judge (or) leave . . . an abiding impression that

the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy

or partiality."  Wilensky, 757 F.2d at 598 (quoting Warner v. Transamerica Ins., 739 F.2d 1347,

1351 (1984)) (internal quotations and citations omitted)).  "Improper conduct of a trial judge

must be inimical and partisan, clearly evident and prejudicial.  In each case there must be

something more to justify a retrial than mere suspicion.  It must appear plain and clear."  Riley,

315 F.2d at 235.  Several isolated prejudicial comments made by a trial judge are not sufficient to

warrant a reversal, and the court must utilize a balancing test to determine whether the

intervention of the trial judge impacted the general fairness of the proceeding.  Wilensky, 757

F.2d at 598.  When the judge's role loses its appearance of neutrality and accentuates and

emphasizes the Government's case, the balance tips against a criminal defendant.  Id. (citing

United States v. Bland, 697 F.2d 262, 265 (8th Cir. 1983)).  "When unfair judicial procedures

result in a denial of due process, reversal is required.  Good faith mistakes of judgment or

misapplication of the proper rules of law by the district court are acts which do not reflect great

bias on the part of the trial judge.  Thus, their occurrence does not mandate reversal."  Wilensky,

757 F.2d at 598.

   **a.**  ***General Intervention***

   Defendant Gabriel argues that the court was over-involved in the development and

presentation of the Government's case.  Specifically, he contends that the court interrupted

defense counsel; posed objections to defense counsel's examination where none were raised by

the Government; instructed the Government on which questions to ask of its witnesses; asked the

Government's questions for it; instructed the prosecutor on how to lay foundation for the

admission of evidence; and utilized language that created the appearance of some allegiance

between the court and the Government.  In addition, defendant Edinborough argues that the court

improperly questioned witnesses to bring clarity to the testimony being sought by the

Government.

   The record in this matter demonstrates that the trial judge maintained impartiality and the

appearance of impartiality throughout the trial in this matter.  Any intervention by the trial judge

was well-within his role as a judicial officer and did not accentuate or emphasize the

prosecution's case to the detriment of any defendant.  The trial judge never assumed the role of

an advocate, and his questions and remarks were for permissible general trial management

purposes as laid out by the Federal Rules of Evidence and the law of this Circuit.  The court did

not comment in front of the jury on the credibility of any witnesses or the abilities of any counsel

involved in the matter.  The court's intervention did not serve to bolster the Government's case,

nor did it interfere with the defendants' ability to conduct cross-examination so as to deprive any

defendant of his right to a fair trial.  While the court permitted the prosecution a complete direct

examination of its witnesses, the scope and breadth of the cross-examination it allowed to the

defense was not only full, but, one might argue, unbridled.  An excerpt from the cross-

examination by counsel for defendant Gabriel of cooperating co-conspirator Sylvester follows:

> Q:   Now, throughout your testimony you've mentioned about
>       praying and God has forgiven you; is that correct?
>
> A:   Yes ma'am.
>
> Q.   So is it your testimony that you're somewhat familiar with
>       religious matters?
>
>       Is that correct?
>
> A.   Yes, ma'am.
>
> Q.   Are you familiar, sir, with the seven deadly sins that afflict
>       the man's soul?
>
> A.   Seven deadly sins that afflict the man's soul?
>
> Q.   Proverbs, sir.

| THE COURT: | Counsel, if you want to ask him his religion and what his background is, ask him specifically.  But don't go declaring what you know perhaps to be something important to you. |
| MS. FERRON: | Are you familiar with that phrase, sir? |
| THE COURT: | What phrase? |
| MS FERRON: | "Seven deadly sins that afflict a man's soul." |
| THE WITNESS: | I'm familiar, yes, ma'am. |
| MS FERRON: | Thank you. Nothing further. |

Trial Tr. 100-01, Nov. 15, 2006.

The court finds, upon review of the trial record in its entirety, that its questions and remarks made during trial were within the scope of the role of a trial judge, and do not require the grant of a new trial.

### b.   *Rule 29 Motions*

Defendant Edinborough argues that the court impermissibly instructed the Government to dismiss him from the conspiracy count, Count I, of the Superseding Indictment in order to avoid granting the oral Rule 29 motions for acquittal of Count I that were made by all defendants charged.  Edinborough does not have standing to make this argument and cannot establish any prejudice as to his substantive rights, because his motion on Count I was granted.  Considering this argument with respect to the other defendants, the court finds that this argument does not provide a basis for new trial as the court did not coach the Government.  After the Government conceded that no evidence connected the two alleged suppliers charged in the conspiracy, the

court told the Government that it could either make an election and dismiss one of the suppliers, or that the court would rule on the motions for acquittal.  The court did not require the government to make an election, nor did it tell the government which election to make.  The dismissal of the conspiracy count as to all defendants charged was not required at that point.  The Government made its own decision as to how it wanted to proceed with its case.  By giving the Government the time to make such a decision, the court did not abuse its discretion or violate the right of any defendant to a fair trial.

        **c.**     ***The Government's Reading of Transcripts During Closing and Rebuttal Argument*s**

      Edinborough argues that the court inappropriately permitted the prosecutor to read lengthy excerpts of the testimony of Government witnesses during closing and rebuttal arguments, which he contends had the effect of permitting the Government to present its case a second time to the jury.

      During the Government's closing argument, defendants made multiple objections on the basis that the Government was attempting to argue facts that were not in evidence.  See, e.g., Trial Tr. 53, Nov. 28, 2006.  Based on defendants' vociferous objections, the court directed the prosecutor to refer to the transcript rather than summarizing or interpreting the testimony.  Trial Tr. 53, 57, 79, Nov. 28.  The court also directed defense counsel to use the transcripts.[14]  This direction to all counsel to utilize the transcripts was appropriate under the circumstances of this case, and was not, as defendant Edinborough argues, a grant of permission for the Government to

---

      [14] The court directed counsel for defendant Thomas, shortly after he began his closing argument, "But if you're going to . . . cite to something, then you're obligated, as counsel was for the government, to find it in the record and read it to the jury."  Trial Tr. 184, Nov. 28, 2006.

present its entire case-in-chief a second time.  Before closing arguments commenced, the court

told all counsel that it would not impose any arbitrary time limits on their arguments, and its

decision not to impose a limit on the Government's closing and rebuttal argument, or the closing

argument of any defendant, was not misconduct prejudicial to the rights of the defendants.

### d. *Questions Posited to Counsel for Defendant Thomas During Opening Statement*

Defendant Thomas argues that the court improperly interfered during his counsel's

opening statement to the jury, and that this inference resulted in a violation of his constitutional

rights, specifically his right against self-incrimination as guaranteed by the Fifth Amendment.

The court finds that this argument is without merit and is not a basis for granting a new trial.

In preliminary instructions, the court had instructed the jury and all counsel that in the

opening statement and oral argument counsel could not testify.  Defense counsel for Thomas

proceeded to defy the court.  During his opening statement, Dwight Thomas, the defense counsel

for Thomas summoned his wheelchair-bound client to his side and addressed to the jury as

follows:

| | |
|---|---|
| MR. THOMAS: | I represent Alrick[sic] Thomas, and only Alrick Thomas. Alrick Thomas is 36 years old, and, as you see, he's paraplegic, and will be, and is – |
| MS. SMITH: | Objection, Your Honor– |
| THE COURT: | Sustained. |
| MR. THOMAS: | This is my client – |
| THE COURT: | Just a minute. |

|  |  |
|---|---|
|  | There is no evidence in this case yet as to the age of your client, or even whether he is a paraplegic. |
| MR. THOMAS: | I'll rephrase, Your Honor.  I expect the evidence to show -- |
| THE COURT: | I would suggest that Mr. Thomas – |
| MR. THOMAS: | I'm sorry, Your Honor. |
| THE COURT: | – go back to his place, his seat, while you address the jury. |
| MR. THOMAS: | Thank you, Your Honor. I expect the evidence in this case to show you that Alrick Thomas is 36 years old.  I expect the evidence in this case to show you that – |
| THE COURT: | Don't – go ahead. |
| MR. THOMAS: | – he is wheelchair bound, and will be wheelchair bound as a result of being paraplegic. |
| THE COURT: | Who will testify to that, sir? |
| MR. THOMAS: | Some family members, Your Honor. I have family members available to testify to that, Your Honor. |
| . . . |  |
| THE COURT: | For what purpose? |
| MR. THOMAS: | I'm sorry, I didn't hear the Court. For what purpose? |
| THE COURT: | Would you intend to call a person as a character witness? |
| MR. THOMAS: | It's possible, Your Honor, that I |

|  |  | could call a 404(a) witness – |
|---|---|---|
| THE COURT: | | Well, not possibly.  If you're going to tell the jury something is going to be evidence in the case, you have a duty to say who is going to say it. |
| MR. THOMAS: | | And Your Honor, that evidence can also come from other people that the government will call. |
| THE COURT: | | Well, it may.  But you're making the statement.  You have the obligation to say who is going to testify. |
| MR. THOMAS: | | Your Honor, I expect that Meleek Sylvester will testify he is a paraplegic. |
| THE COURT: | | Will tell the jury that? |
| MR. THOMAS: | | Yes.  I would suspect that Meleek Sylvester, who is the only witness that is going to testify in this case against Mr. Alrick Thomas, will testify that he knew at the time that he met Alrick Thomas, that Alrick Thomas was a paraplegic, and had been a paraplegic since 1999. |

Trial Tr. 33-35, Nov. 8, 2006.  Thomas argues that the court's interruption of his counsel's opening statement "constituted improper judicial interference because neither defendant Alric Thomas' age nor his handicap related to a significant element of the case."[15]  Thomas Mem. Law in Supp. Post-Trial Renewed R. 29 Mot. for J. Acquittal or Alt. R. 33 Mot. For New Trial 7.

An opening statement presented to a jury is limited in scope "to a general statement of

---

[15] Defendant Thomas moved for a mistrial on the basis of the court's interruption and direction upon conclusion of opening arguments, following the close of the Government's case-in-chief, and following conviction.  The court denied each motion.

facts which are intended or expected to be proved.  An opening statement is not designed to be an evidentiary recitation which minutely describes in detail, rather than generally outlines or foreshadows, the testimony to be produced."  United States v. DeRosa, 548 F.2d 464, 470-71 (3d Cir. 1977).

Shortly after counsel began his argument, the government objected, which objection the court sustained.  The court's subsequent query of defense counsel was appropriate to ensure that counsel kept his opening statement within the proper scope.  Defense counsel made representations to the jury about what evidence would be produced, with no reference as to who would testify to such facts.  Counsel's statements were impermissibly testimonial.

Thomas argues that the court's inquiry violated the Fifth Amendment's prohibition of adverse comment by a judge concerning a defendant's failure to take the stand in a criminal trial. This argument is simply unsubstantiated by what transpired and is disingenuous.  The court never asked whether defendant Thomas would testify to those facts stated by counsel, but, rather, asked counsel to identify a witness.  Sylvester could hardly have been qualified to testify that defendant Thomas was actually a paraplegic or that he would always be in that condition.  Indeed, counsel by his statements, in effect, arguably could have waived his client's right not to testify.  As the court explained to counsel during a sidebar conference, the court's question actually "deflected [defense counsel's] insinuation that [defendant Thomas] was going to testify by suggesting that the source of your earlier statement would be some person other than your client."  Trial Tr. 59, Nov. 8.

The court's inquiry was appropriate, particularly because counsel's statements appeared to be an unadulterated appeal to jury sympathy, which again violated the court's basic instructions

to the jury.  In addition, counsel possibly opened the door as to even how his client became a paraplegic.  The court not only acted within its authority but tried to do so in a way that would allow defense counsel to realize that he had made a mistake and give him a chance to correct it. The requirement not to testify was applied consistently as to all counsel.[16]  See Trial Tr. 66, Nov. 8.  The court had to remind all counsel of the Rules of Professional Conduct on this score.

In short, the court finds that its question was not prejudicial such that the jury may have inferred Thomas' guilt as a result, that it properly denied Thomas' repeated motion for a mistrial on this basis, and that defendant's motion for a new trial on this basis is denied.  Indeed, not only did the court give defense counsel an opportunity to restart his opening, but it also gave a careful instruction to the jury about what was not evidence and that the defendant had no burden to produce evidence.

### e.    *Other Arguments*

Defendant Edinborough also argues that the court failed to be impartial in instructing the jury to remove certain defendants from consideration in their deliberations as to amount and that the court improperly controlled the testimony of jurors during the hearing regarding allegations of juror misconduct held on June 1, 2007.  The court finds these arguments to be without merit, and addresses each in greater detail below.

Having considered the various arguments advanced by defendants alleging judicial misconduct separately and as collectively, the court concludes that the trial judge's actions,

---

[16] Judicial control over opening statements and closing arguments is critically important under the unwritten "tit for tat" rule.  If one side is permitted to trespass the parameters of acceptable speech, then all would be entitled to trespass in like kind.  Review of the transcript shows that all counsel invoked "tit for tat" arguments, which required constant judicial vigilance.

questions and remarks did not create an appearance of impartiality such that any defendant's substantive right to a fair trial was compromised.  The trial judge acted within his authority, did not create an appearance of any allegiance with the Government, and gave each party an opportunity to fully present its case.

### 4.        Allen Charge

Defendant Gabriel contends that the court charged the jury with an impermissible Allen charge after the jury disclosed a non-unanimous verdict, which then resulted in a coerced verdict. Defendant Edinborough alleges that after this alleged Allen charge, the court further erred by directing the jury to remove defendant Brewley from consideration in their subsequent deliberations as to amount.  The court finds that these arguments are without merit and do not present a basis for granting a new trial.

On December 5, 2006, on the third day of deliberations, the jury sent to the court a note that they had "come to a decision on all verdicts, all defendants, all counts."  Trial Tr. 4, Dec. 5, 2006.  The court brought the jury into the courtroom, where the foreperson reported that the jury found each defendant guilty on each count, and the jurors indicated to the court that it was their own "individual decision, as well as [their] collective decision."  Trial Tr. 6-7, Dec. 5.  No counsel requested individual polling of the jurors.  The court then recorded a verdict of guilty as to each count charged, for each defendant.  Trial Tr. 7, Dec. 5.

Next, the court directed the jury to deliberate as to the amount of cocaine that they found for each count, as to each defendant.  Trial Tr. 7, Dec. 5.  Shortly after the jury commenced deliberations as to amount, one juror requested to speak with the court.  Trial Tr. 15, Dec. 5.  The

court proceeded to ask each juror individually whether the verdict reported for each count for

each defendant was his or her individual verdict. Trial Tr. 15-48, Dec. 5. Juror Six reported that

even though she had signed the jury verdict form evidencing a unanimous guilty verdict as to

defendant Brewley, she did not reach a unanimous decision based upon her individual decision.

Trial Tr. 28, Dec. 5.

      After polling the jurors individually on the record, except for Juror Six, the court gave the

jury the following instruction: "Jurors, return to the jury room and report back to me, whether

you have a unanimous decision, or you do not. Would you please do so." Trial Tr. 39, Dec. 5.

      While the jury continued its deliberations, the court made the following record ruling and

so informed the parties:

> There was a report of unanimous decision by the foreperson, guilty
> as to all counts as to all defendants charged.
>
> There was a general poll of the jury, and my observation was that
> no one on the jury said no, and that all said yes. I molded the
> verdict based upon the report of the jurors, guilty as to all
> defendants as to all counts.
>
> Subsequently, after the charge to the jury with respect to amount,
> one of the jurors made it known that the decision reported was not
> her individual decision.
>
> I've concluded that as a matter of law, the verdict was taken, it was
> molded, and it was entered and it stands.

Trial Tr. 41, Dec. 5.

      The court then polled Juror Six as to her individual verdict as to each count for each

defendant. Trial Tr. 46, Dec. 5. She reported a verdict of guilty with respect to every count for

every defendant excluding Roy Brewley. Trial Tr. 46-47, Dec. 5. She reported a verdict of not

guilty for both counts with which Brewley was charged.  Trial Tr. 47, Dec. 5.

      The court then instructed the jurors to "deliberate on amount as to all defendants, including Mr. Brewley, would you please, consistent with the instructions previously given to you." Trial Tr. 48, Dec. 5.  The following day the court submitted special interrogatories to the jury consistent with the matter on which they had been deliberating.  Trial Tr. 13, Dec. 6, 2006.

 The court then made the following charge to the jury:

> For legal reasons which I will not get into, the Court molded and entered a judgment of guilty on the record as to Count 1 as to all defendants, including Mr. Brewley.
>
> These questions include, include Count 1, for you to answer in accordance with how the Court has molded the verdict as to Count 1.
>
> The Court recognizes that one juror has represented that Mr. Brewley is not guilty as to Count 1.  And following receipt of your answers to these questions, I will pose to you a separate question as to Count 1, leaving Mr. Brewley out.  But that's a separate undertaking.

Trial Tr.13, Dec. 6.  The court then charged the jury on the special interrogatories as to amount of cocaine under each count.  Trial Tr. 13-14, Dec. 6.

      After several hours of deliberations, the jury reported that it was unable to reach a unanimous decision regarding amount as to Counts I and VIII.  Trial Tr. 19-20, Dec.6. Consistent with its previous statement to the jury, the court then submitted, for the jury's consideration, the questions as contained in the special interrogatories, regarding amount of drugs, concerning Counts I and VIII, removing the name of defendant Brewley.  The jury as a whole had reported a unanimous decision of guilty for all other defendants on all counts.  Trial Tr. 20-22, Dec. 6.  The jury deliberated and then reported that it had reached a unanimous

decision as to amount on Counts I and VIII, having removed defendant Brewley from consideration.  Trial Tr. 24, Dec. 6.

The court then molded the verdicts as to guilt and amount in accordance with the jury's reported verdicts, excluding Brewley from Counts I and VIII.  Trial Tr. 35, Dec. 6.  After the jury was discharged for the day, the court told defendants that it had reconsidered its position as to the guilty verdict as to Brewley, and declared a mistrial as to defendant Brewley only on both counts. Trial Tr. 38, Dec. 6.

The court finds that no part of the jury charge was an improper Allen charge.  In Allen v. United States, 164 U.S. 492 (1896), the United States Supreme Court approved a jury charge directing jurors whose views constituted a minority to reconsider their views in light of those held by the majority of jurors.[17]  164 U.S. at 501-02.  Such a charge is commonly referred to as an "Allen charge," and is prohibited by the Third Circuit as impermissibly coercive.  United States v. Fioravanti, 412 F.2d 407 (3d Cir. 1969), cert. denied sub nom. Panaccione v. United

---

[17] The Court charged in Allen:

> [A]lthough the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself.  If upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.

164 U.S. at 501.

States, 396 U.S. 837 (1969).  In Fioravanti, the objectionable charge, made at the end of the court's charge to the jury, directed the jurors as follows:

> The jury should listen with deference to arguments of fellow-jurors and distrust of his own judgment if he finds a large majority of the jury taking a different view of the case from that what he does, himself.

Id. at 415.  The Third Circuit held that "[h]ereafter, in this circuit, trial judges are not to give instructions either in the main body of the charge or in the form of a supplement that direct a juror to distrust his own judgment if he finds a large majority of the jurors taking a view different from his."  Id. at 420.

None of the charges given to the jury after it reported a unanimous verdict to the court was an impermissibly coercive charge.  First, the supplemental charge, "Jurors, return to the jury room and report back to me, whether you have a unanimous decision, or you do not.  Would you please do so," given after an individual juror belatedly indicated during deliberations on amount that the recorded unanimous guilty verdict for all defendants on all counts had not represented her individual verdict with respect to the charges against Brewley, made no reference to a minority or majority viewpoint.  Second, when the court instructed the jurors on amount of drugs, both including and excluding Brewley, it made no reference to minority or majority viewpoints.  The court's jury charges were not impermissible Allen charges.  They were permissible, and necessary given the unusual circumstances confronting the court.

While the Third Circuit has also found that a jury instruction in which the district court references the costs and burdens of holding a second trial is improperly coercive, the trial court in this matter made no such reference in any jury charge.  See United States v. Eastern Med. Billing,

Inc., 230 F.3d 600, 609 (3d Cir. 2000) (citing United States v. Burley, 460 F.2d 998, 998 (3d Cir. 1972)).

With respect to Edinborough's argument that the court's instruction to the jury to consider amount as to Counts I and VIII, excluding Brewley, was impermissibly coercive, the court finds that argument meritless. The instruction was permitted under law. The court's charges and instructions did not steer the jurors toward any verdict. The jury had, in open court, reported a unanimous guilty verdict as to all defendants and the same was recorded. As such, the verdict was enforceable. The court, over Government objection, permitted Juror Six to change her verdict as to Brewley, as requested. The jury had always been unanimous as to Edinborough's guilt and would have to determine amount of drugs as to him and the other defendants, except Brewley, anyway.

While the jury was deliberating as to amount, the court had the opportunity to reconsider defendant Brewley's oral motion for a mistrial and decided to grant it as to Brewley on Counts I and VIII. Having granted Brewley's motion, the court informed the jury that its deliberation obligations on amount did not encompass Brewley. In doing so, the court's instruction to the jury contained no coercive element.

The court concludes that no jury charge was an impermissible Allen charge or otherwise impermissibly coercive so as to require a new trial.

### 5.    Juror Misconduct

Defendants argue that there is evidence of juror misconduct and bias that compromised defendants' right to a fair trial, entitling them to a new trial. This contention mirrors arguments

previously presented by the defendants, as described below.  The court finds, as it did previously, that there was no jury misconduct that requires the grant of a new trial.  Further, defendant Edinborough argues that the court exhibited improper bias in the manner in which it conducted the post-verdict hearing investigating allegations of jury misconduct.  The court finds that this argument is without merit.

On May 10, 2007, Edinborough filed a Motion for Investigation into Jury Misconduct, Request for Permission to Interview Jurors, and Other Relief, along with an unsigned letter from Alternate Juror Linda P. Maratea.  This letter contained allegations relating to a conversation that allegedly took place between Maratea and deliberating juror Feldere Webster-Lee[18] during the first week of trial and prior to deliberations.  Maratea alleged that during this conversation, Webster-Lee told her that Edinborough was a Mason belonging to the Prince Hall Masonic Lodge, that members of this Lodge were out of control and needed to be stopped, and that Lodge members had been prosecuted for a violent crime in the recent past but had been acquitted because they were Masons.

The court granted Edinborough's motion to conduct a post-verdict polling of the members of the jury, over the Government's objections.  The court held a hearing on June 1, 2007 for that purpose, over six months after the trial.  All remaining defendants made a joint motion for a new trial, arguing that the jury had been exposed to extraneous prejudicial information.  In a Memorandum and Order dated June 18, 2007, the court denied Defendants' motion for a new trial.  The court made several findings of fact as to what extraneous information was introduced as to one of the jurors, namely that defendant Edinborough was a Mason and a

---

[18] Webster-Lee served as foreperson of the jury.

member of the Prince Hall Masonic Lodge.  Applying the standard articulated by the Third Circuit in United States v. Lloyd, 269 F.3d 228, 238 (3d Cir. 2001), the court found that a hypothetical average juror would not have been prejudiced by such extraneous information, had it been mentioned.  The court incorporates by reference its June 18, 2007 Memorandum and Order in full, as if fully reiterated herein.

The court also made certain credibility determinations in concluding just what extraneous information, if any, was introduced to the panel prior to deliberations.  The court discounted the credibility of Maratea, the letter writer, whose motivation it found to be highly suspect, for various reasons including the manner in which the letter was composed and its statement that there was no evidence presented at trial regarding defendant Edinborough, where in fact, there was overwhelming evidence of guilt, if the cooperators were believed.  Further, by her letter, Maratea acknowledged that she had an ongoing association with the Masons group, which was one obvious bias to favor Edinborough.  Finally, Maratea testified that the conversation she had with Webster-Lee was not in a whisper and was heard by other jurors.  Maratea Test., Jury Investigation Hr'g 10-11, June 1, 2007.  Each of the other deliberating jurors, when individually polled, testified that she or he had heard no such conversation.

Webster-Lee admitted that she had a conversation with Maratea about the Territorial Court trial that had involved defendants who were rumored to be Prince Hall Masons.  In her testimony, Webster-Lee specifically countered the assertions of bias raised by Maratea's letter and testimony:

THE COURT:          When you were selected as - - when you
                    went through the voir dire process, did you
                    acknowledge that you knew Mr.

|                |                                                              |
| -------------- | ------------------------------------------------------------ |
|                | Edinborough?                                                 |
| WEBSTER-LEE:   | I know him by seeing him, not being affiliated by him.       |
| THE COURT:     | Did you have any opinion of him at that time, that he must have been guilty of something because he was charged in this case? |
| WEBSTER-LEE:   | No, not at the time.                                         |
| THE COURT:     | Did you undertake to answer every question that was asked of you in the voir dire process truthfully? |
| WEBSTER-LEE:   | Yes, I did.                                                  |
| THE COURT:     | When you started the case, did you accord to Mr. Edinborough the presumption of innocence? |
| WEBSTER-LEE:   | Yes I did.                                                   |

. . .

|                |                                                              |
| -------------- | ------------------------------------------------------------ |
| THE COURT:     | Did you have any conversation with [Ms. Maratea] about God?  |
| WEBSTER-LEE:   | No.                                                          |
| THE COURT:     | Did she tell you that God was not in the courtroom, and God was not to be a factor in the case? |
| WEBSTER-LEE:   | No.                                                          |
| THE COURT:     | Relative to this case that was in the paper about a beating, did something come up about those persons being found innocent? |
| WEBSTER-LEE:   | I can't recall.                                              |

Page 79 of 85

| | |
|---|---|
| THE COURT: | Was there any discussion about those persons being found innocent because they were Masons? |
| WEBSTER-LEE: | I can't recall. |

. . .

| | |
|---|---|
| THE COURT: | At the time that you were having a conversation with Ms. Maratea in the Court - - in the deliberations room, did you hold a belief that the Masons who had been acquitted in the case that was in the newspaper had been acquitted because they were Masons? |
| WEBSTER-LEE: | I don't think so. |

...

| | |
|---|---|
| THE COURT: | After having the conversation with Ms. Maratea about Prince Hall Masons, were you at that point determined to find Mr. Edinborough guilty of the charges against him? |
| WEBSTER-LEE: | No. |

Webster-Lee Test., Jury Investig. Hr'g 23-28.  Webster-Lee also testified that, prior to her conversation with Maratea, she knew of Edinborough through other masons, believed he spent time with persons she knew to be Prince Hall Masons and had been told that he was a Mason. Webster-Lee Test., Jury Investig. Hr'g 21-23.  Webster-Lee explained how Edinborough's name came up in the conversation with Maratea:

| | |
|---|---|
| THE COURT: | Why did the name of Mr. Edinborough come up in the conversation with Ms. Maratea? |

JUROR WEBSTER:    Like I said before, it all started with the kids and her son, her son's father.

THE COURT:    But - -

JUROR WEBSTER:    We started the conversation talking about her kids.

THE COURT:    But how did Mr. Edinborough's name come up?

JUROR WEBSTER:    Because he - - she, she have seen her son's father affiliated with Mr. Edinborough.

THE COURT:    Who said that?

WEBSTER-LEE:    Ms. - - Linda.  She have seen them all together?

THE COURT:    That's what she said?

WEBSTER-LEE:    That's what she said.

THE COURT:    And what, if anything, was your response to that?

WEBSTER-LEE:    They all hang out together?

THE COURT:    And what do you mean by "hang out together?"

WEBSTER-LEE:    I have seen them in Frank's Bakery.  I have seen them at Greenhouse.  I have seen them at Back Street.  I have seen them on Main Street, talking.  I have seen her son's father talking with them.

THE COURT:    And did you in any way mean that, by "hanging out," that they were, they had to be engaged in criminal activity?

WEBSTER-LEE:    Not that kind of hanging out; just basically

> standing and talking on the corners, or
> having whatever conversations there are.

Jury Investig. Hr'g 25-26.

At the hearing, the court also found that the statements that Edinborough's rebuttal witness, Johana Nicole Smith, attributed to Webster-Lee were problematic because they were post-verdict ruminations attributed to a deliberating juror, and that such ruminations could be the result of post-verdict exposure to street information or something else.  Jury Investig. Hr'g 117. Passage of time, particularly months, by reason of exposure to information not part of the controlled trial setting, could result in a personal opinion about a defendant.  Therefore, Smith's testimony was irrelevant, even if she was believable, because it was not competent evidence as to issues before the court.

The court's finding that a hypothetical average juror would not have been prejudiced by the extraneous information that Edinborough was a Mason and a member of the Prince Hall Masons Lodge did take into consideration the fact that the trial did not involve any claim that Prince Hall Masons as individuals or a group committed any wrongdoing including illegal drug smuggling.  No discussion of Prince Hall Masons, specifically, or Masons, generally, appears in the trial transcript.

R. Rawlins argues that the court improperly gave "great weight to Ms. Webster-Lee's assertions regarding whether or not her bias and prejudice prevented her from performing her duties as required by the Constitution."  Mem. Law in Supp. of R. Rawlins' Mot. New Trial 16. The court did find that a hypothetical average juror would not have been prejudiced by this extraneous information, and alternatively, also credited the testimony of Webster-Lee, which

included her testimony that she answered each question posed to her during the <u>voir dire</u> process truthfully and that she only knew of Edinborough by seeing him, but did not know him personally and had no affiliation with him.  Webster-Lee Test., Jury Investigation Hr'g 21-23. The court also credited her testimony that she accorded defendant Edinborough the presumption of innocence at the start of the trial, and it must be presumed that she did so throughout the trial. Jury Investig. Hr'g 23-24.  In fact, the record reflects Edinborough's strenuous objection to the court's intended question as to whether she had accorded that presumption throughout the case, and into deliberations.  Jury Investig. Hr'g 24.  The court granted Edinborough's motion and sustained that objection, which, under the rules of the trial in this matter, was joined by all defendants.  <u>See</u> Webster-Lee Test., Jury Investig. Hr'g 23-24.

During the record hearing on June 1, 2007, the court noted that, separate from its analysis as to whether a hypothetical average juror would have been prejudiced, there was no testimony from either Maratea or Webster-Lee suggesting that Webster-Lee had disregarded the court's instructions or that she could not be a fair and impartial juror.  Jury Investig. Ht'g 117-18. Pursuant to <u>Lloyd</u>, these alternative findings are not part of the hypothetical juror analysis conducted by the court.  <u>See</u> 269 F.3d at 238.

The court will address the additional arguments defendants have made alleging that juror misconduct warrants the grant of a new trial, but it will not re-examine its findings of fact and credibility determinations, despite the requests by some defendants.

Defendant Edinborough argues that the trial court displayed improper bias in its control of the testimony of witnesses during the June 1, 2007 hearing to the detriment of defendants' rights, and that such judicial misconduct requires the grant of a new trial.  This argument is

without merit.  For instance, counsel for defendant Edinborough requested, during the record hearing, that the court ask Webster-Lee if she was then affiliated with the St. Thomas Masonic Lodge.  Jury Investig. Hr'g 30.  The court denied this request.  Jury Investig. Hr'g 30.  The court did not permit Webster-Lee to provide testimony on that because her current state of affairs or state of mind was irrelevant to the issue before the court.  The court's exercise of authority to restrict testimony to that which was relevant cannot be characterized as bias against the defendants.  Moreover, the court granted a defense motion for an extraordinary post-verdict hearing. This evidenced interest in fundamental justice consistent with <u>Lloyd</u>.  <u>See</u> 269 F.3d at 238.

Further, when counsel for Edinborough announced, after all of the jurors had been excused from the hearing, that he had a rebuttal witness to present, the court indicated that the jurors, specifically Webster-Lee, were not subject to recall because of the fact that counsel delayed declaring to the court the existence of a witnesses.  Jury Investig. Hr'g 54-59.  At that point in time, it may have been that all jurors, including Webster-Lee, had been excused.  The court, nevertheless, received the testimony of witness Smith, but exercised its discretion to terminate the hearing after her testimony and restrict its focus to issues permitted under <u>Lloyd</u>.

The interests of justice do not require the grant of a new trial based upon alleged juror misconduct.  The extraneous information, which the court found had passed between Maratea and Webster-Lee only, would not have prejudiced a hypothetical average juror.  The trial court's handling of the defendants' joint motion for new trial on the basis of alleged juror misconduct does not reveal any bias so as to warrant the grant of a new trial.  To the extent that the standard for new trial on the basis of newly discovered evidence applies, which the court does not believe

is the case in light of the standard propounded by the Third Circuit in <u>United States v. Lloyd</u>, 269 F.3d at 238, defendants have not met their burden of establishing the required factors.

### 6. <u>Sufficiency of the evidence</u>

To the extent that the defendants' motions can be understood to argue that a new trial should be granted because the jury's verdict is contrary to the weight of the evidence, the court finds, upon review of the evidence presented during trial, that the jury's verdict is consistent with the weight of the evidence.  The court concludes that there is no serious danger that a miscarriage of justice has occurred.  <u>See</u> <u>United States v. Johnson</u>, 302 F.3d 139, 150 (3d Cir. 2002), <u>cert. denied</u>, 537 U.S. 1140 (2003).  In reaching this conclusion, the court has, in its discretion, weighed the evidence presented at trial.  In so doing, the court credits, as the jury apparently did, the testimony of each cooperating witness.

## IV.  CONCLUSION

For the reasons stated above, defendants post-trial motions for relief pursuant to Fed. R. Crim. P. 29 and 33 are denied in full.  An appropriate order follows.